## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## TERRE HAUTE DIVISION

| | | |
|---|---|---|
| GLENN PATRICK BRADFORD, | ) | |
| | ) | |
| Petitioner, | ) | |
| v. | ) | Case No. 2:13-cv-410-JMS-WGH |
| | ) | |
| RICHARD BROWN, | ) | |
| | ) | |
| Respondent. | ) | |

### Entry Discussing Amended Petition for Writ of Habeas Corpus,
### and Granting Certificates of Appealability Regarding Selected Claims

Petitioner Glenn Patrick Bradford was convicted by a jury of murder and arson in 1993 in Indiana state court. He is currently serving an eighty-year sentence for those crimes. He maintains that several constitutional violations during his state court proceedings entitle him to federal habeas relief. He also contends that he has made a showing of actual innocence, which allows him to pursue constitutional claims that are otherwise procedurally defaulted.

For the reasons that follow, Mr. Bradford has failed to demonstrate that he is entitled to habeas relief. Accordingly, Mr. Bradford's amended petition for a writ of habeas corpus is **denied**. The Court issues certificates of appealabilty on the claims specified at the end of this Entry.

## I.
## Background

On June 17, 1993, Mr. Bradford was convicted by a jury of murder and arson. His convictions were upheld by the Indiana Supreme Court. *See Bradford v. State*, 675 N.E.2d 296 (Ind. 1996) ("*Bradford I*"). Mr. Bradford sought post-conviction relief in state court, the denial of which was affirmed by the Indiana Court of Appeals in *Bradford v. State*, 988 N.E.2d 1192 (Ind. App. 2013) ("*Bradford II*").

District court review of a habeas petition presumes all factual findings of the state court to

be correct, absent clear and convincing evidence to the contrary.  *See Daniels v. Knight*, 476 F.3d

426, 434 (7th Cir. 2007).  Mr. Bradford maintains that certain factual findings of the state courts

were incorrect.  The Court will discuss those disputes as necessary below.  For the purposes of this

Background section, however, the Court sets forth the factual and procedural background as

summarized by the Indiana Court of Appeals in *Bradford II*:

> During the period relevant to this case, Bradford was an officer with the Evansville
> Police Department. He worked the night shift from 10:30 p.m. to 6:30 a.m. Trial
> Tr. p. 2394.
>
> Bradford had an extramarital affair with Lohr during the four years prior to her
> death. *Id.* at 2219. Hoping to force a split between Bradford and his wife Dawn,
> Lohr sent Dawn several anonymous notes in 1990 informing her of the affair. *Id.* at
> 2146–49. Lohr dictated the notes to male friends to disguise their origin. *Id.* at 2146.
> The notes caused problems in the Bradfords' marriage. Bradford promised Dawn
> he would end the affair, but he continued to see Lohr, regularly stopping by her
> house before and after his shift.
>
> In June 1992, Dawn discovered that Bradford and Lohr's affair was ongoing. As a
> result, Bradford told Lohr their affair had to end and returned his copy of her house
> key. *Id.* at 3307. During that same month, Lohr sent Bradford seven angry e-mails
> about his attempt to end their affair. *Id.* at 2065–71. She said that if Dawn ever
> asked her if she and Bradford were continuing their relationship, she would "tell
> [Dawn] we are . . . I don't care how long we've been separated." *Id.* at 2069. Lohr
> reminded Bradford that the two of them had gone to a photographer to have their
> portrait taken, and she threatened to show the photographs to Dawn. *Id.* at 2068.
> Two to three weeks before Lohr's death, Bradford told his partner Officer Brian
> Hildenbrant that he and Lohr were having problems. *Id.* at 2220. Bradford
> continued to stop by Lohr's house before and after his shift on occasion.
>
> On the evening of August 1, 1992, Lohr was at her house in Evansville. She spoke
> with her father on the telephone from 10:25 p.m. until shortly before 11 p.m. *Id.* at
> 2050. At 6:35 a.m. the next morning, Bradford reported a fire at Lohr's house. *Id.*
> at 833. He told the dispatcher he was at the scene and there was a fatality. *Id.* When
> the first responders arrived, Bradford met them and said, "Tammy's inside." *Id.* at
> 981. He also said, "She's dead, she's dead, she's got to be dead." *Id.* at 984.
> Bradford told one officer he had not been able to get inside due to fire and smoke,
> *id.* at 960, but he told another officer Lohr "was on the bed and the bed was on fire,"
> *id.* at 1002. He told yet another responder, "I couldn't get her out." *Id.* at 1039.
> Bradford later said during questioning by detectives that he crawled into the house,
> saw that the fire was in the bedroom, and crawled back out. *Id.* at 2476–77.

By coincidence, one of the firefighters who went to the scene, Randy Baugh, had driven by Lohr's home at 6:30 a.m. on his way to a nearby fire station. *Id.* at 1059. He did not see any signs of fire at that time. *Id.* Bradford's report of a fire was received shortly after Baugh arrived at the fire station, and he returned to Lohr's house. *Id.* at 1060. Thick black smoke was pouring out of the home's roof vents and front door. *Id.* at 1094. Baugh entered the house, found the fire in a bedroom, and extinguished it. *Id.* at 1070. He found Lohr's body on a bed in the bedroom. *Id.* at 1071. Baugh estimated that the fire could not have been burning for more than a few minutes. *Id.* at 1087. Brian Owen, another firefighter who reported to the scene, agreed with Baugh's estimate. *Id.* at 1134.

After the fire, a detective drove Bradford back to police headquarters. The detective saw Bradford sitting at a computer at around 8 a.m. *Id.* at 2389. Later, after Bradford learned that it was possible to retrieve deleted e-mails from the police department's system, Bradford admitted to a detective that he had deleted the seven angry e-mails from Lohr on the morning of the fire because "he was trying to remember her in a good light." *Id.* at 2508–09.

Evansville Police Department crime scene investigators discovered an empty gasoline can in the bedroom. *Id.* at 1301. The Evansville Fire Department's fire investigators determined that the fire was intentional; the arsonist had poured gasoline on the mattress where Lohr's body lay and on the floor leading to the bedroom door and then ignited the gasoline while standing in the doorway. *Id.* at 1985. Furthermore, fire investigators concluded that an outside observer could have seen smoke coming out of the house's attic vents within a minute of the fire igniting because the bedroom door was partially open and a "scuttle hole" to the attic was open in the hallway outside the bedroom. *Id.* at 1988. Finally, an investigator concluded that the fire had not been burning for more than seven to ten minutes when Baugh extinguished it. *Id.* at 1995–96.

The medical examiner determined that Lohr had been stabbed or slashed twenty-one times on the back, right shoulder, neck, and cheek. *Id.* at 1886. One of the wounds penetrated her heart, another was in her left lung, and another penetrated her right lung. *Id.* at 1893, 1894, 1895. Lohr's carotid artery was also slashed, possibly several times. *Id.* at 1898. Her body was burned after death. *Id.* at 1903. The examiner was unable to provide a precise time of death because the fire destroyed many of the indicators that he generally considered in making that determination.

Crime scene investigators found the body of Lohr's dog, a small poodle, in the front room of the house. It had been stabbed to death. They also noted signs of an apparent break-in, including a kitchen window with the screen cut out, an open gate in Lohr's backyard, and a telephone line that had someone had manipulated. *Id.* at 964, 1321, 1326, 1559. These actions were executed in somewhat unusual ways. The screen appeared to have been cut from the inside. *Id.* at 1343. And the telephone lines had been stripped and then twisted together such that Lohr would have been

unable to call out but anyone calling her number would have received a busy signal. *Id.* at 2991.

One of the investigators tried to enter the house through the kitchen window, but he could not do it by himself because he needed a ladder to reach the window, and the ladder was too unstable. *Id.* at 1395. With other investigators holding the ladder in place, he managed to climb into the kitchen, but entry was still difficult because the kitchen sink, which was full of dishes, was right under the window. *Id.* at 1396–97. The investigators also noted that there were no indentations in the ground below the kitchen window when they first examined it, but the ladder they used left indentations. *Id.* at 1398. In addition, the back door to the house was locked from the inside when the first responders arrived. *Id.* at 1577. Finally, nothing had been stolen. *Id.* at 1560. The investigators concluded that someone had staged a burglary. *Id.* at 1557.

Next, the evidence revealed a gap in Bradford's whereabouts on the night of August 1 between 10:57 p.m. (when Bradford purchased gas for his patrol car) and 11:49 p.m. (when he was seen driving by a restaurant in central Evansville). *Id.* at 55, 2290, 2668, 2845. A witness saw a marked patrol car at Lohr's house that night at around 11 p.m. *Id.* at 1814. A log kept by Bradford shows that during that period he reported to a hit and run at Main and Michigan, but the officer working the accident, Eric Middendorf, testified he did not see Bradford at the scene. *Id.* at 55, 2813. At 11:26 that evening, Bradford contacted dispatch to request information about George Russell, whom he claimed to have seen. *Id.* at 55, 2779, 3367. However, Russell testified he was at his brother's house at that time. *Id.* at 1804. As for the next morning, a bank located near Lohr's home had an ATM camera directed toward the street, and it captured an image of Bradford's car traveling toward Lohr's home at around 6:30 a.m.

The State charged Bradford with murder and arson. Bradford filed a Notice of Alibi, alleging that he was working when the crimes occurred. During trial, the court allowed the jury to view the crime scene, and jurors visited Lohr's house. Bradford presented evidence in support of his alibi. He also presented expert testimony from Barker Davie, a forensic chemist and fire investigator, to the effect that that the fire had been started before Bradford arrived that morning. *Id.* at 3041. On June 18, 1993, the jury found Bradford guilty as charged. The court sentenced him to eighty years, the maximum possible sentence.

Bradford appealed, and his case went directly to the Indiana Supreme Court. Bradford asked to suspend the appeal and remand to the trial court to clarify the record and hold hearings on newly-discovered evidence. The Court granted Bradford's request. The trial court held a supplementary evidentiary hearing and determined that Bradford was not entitled to a new trial. In due course, the Supreme Court affirmed. *Bradford v. State*, 675 N.E.2d 296 (Ind. 1996).

Bradford filed a petition for post-conviction relief. Thereafter, the State Public

> Defender's Office conducted an extended investigation. During a two-day hearing, Bradford presented testimony from Douglas Carpenter, a fire protection engineer. Carpenter had reviewed the record and performed his own test on a door from Lohr's house. He concluded that the fire began between 4:30 and 6 a.m. PCR Tr. p. 271. On March 2, 2012, the court issued Findings of Fact, Conclusions of Law, and Judgment denying Bradford's petition.

*Bradford II*, 988 N.E.2d at 1195-98.

Following the denial of post-conviction relief in *Bradford II*, Mr. Bradford filed a petitioner to transfer with the Indiana Supreme Court, which was denied on November 21, 2013.  Mr. Bradford then filed a petition for a writ of habeas corpus, and shortly thereafter an amended petition, with this Court.[1]

## II.
## Applicable Law

A federal court may grant habeas relief only if the petitioner demonstrates that he is in custody "in violation of the Constitution or laws . . . of the United States."  28 U.S.C. § 2254(a). "Under the current regime governing federal habeas corpus for state prison inmates, the inmate must show, so far as bears on this case, that the state court which convicted him unreasonably applied a federal doctrine declared by the United States Supreme Court."  *Redmond v. Kingston*, 240 F.3d 590 (7th Cir. 2001) (citing 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362 (2000); *Morgan v. Krenke*, 232 F.3d 562 (7th Cir. 2000)).  Thus, "under AEDPA, federal courts do not independently analyze the petitioner's claims; federal courts are limited to reviewing the relevant state court ruling on the claims."  *Rever v. Acevedo*, 590 F.3d 533, 536 (7th Cir. 2010). "A state-court decision involves an unreasonable application of this Court's clearly established precedents if the state court applies this Court's precedents to the facts in an objectively

---

[1] The Court uses the following citation format when citing to the state court records:  "Trial Tr." for the trial record, "PCR Tr.," for the post-conviction record, and "Supp. R." for the supplemental records.

unreasonable manner." *Brown v. Payton*, 544 U.S. 131, 141 (2005) (internal citations omitted). "The habeas applicant has the burden of proof to show that the application of federal law was unreasonable." *Harding v. Sternes*, 380 F.3d 1034, 1043 (7th Cir. 2004) (citing *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002)).

In addition to the foregoing substantive standard, "federal courts will not review a habeas petition unless the prisoner has fairly presented his claims 'throughout at least one complete round of state-court review, whether on direct appeal of his conviction or in post-conviction proceedings.'" *Johnson v. Foster*, 786 F.3d 501, 504 (7th Cir. 2015) (quoting *Richardson v. Lemke*, 745 F.3d 258, 268 (7th Cir. 2014), and citing 28 U.S.C. § 2254(b)(1)); *see also Anderson v. Benik,* 471 F.3d 811, 814-15 (7th Cir. 2006) ("To avoid procedural default, a habeas petitioner must fully and fairly present his federal claims to the state courts.") (internal quotation marks and citation omitted); *Thomas v. McCaughtry,* 201 F.3d 995, 999 (7th Cir. 2000) ("A state prisoner . . . may obtain federal habeas review of his claim only if he has exhausted his state remedies and avoided procedurally defaulting his claim.").

Insofar as pertinent here, procedural default "occurs when a claim could have been but was not presented to the state court and cannot, at the time that the federal court reviews the habeas petition, be presented to the state court." *Resnover v. Pearson*, 965 F.2d 1453, 1458 (7th Cir. 1992). A federal claim is not fairly presented unless the petitioner "put[s] forward operative facts and controlling legal principles." *Simpson v. Battaglia*, 458 F.3d 585, 594 (7th Cir. 2006) (citation and quotation marks omitted). "A federal court may excuse a procedural default if the habeas petitioner establishes that (1) there was good cause for the default and consequent prejudice, or (2) a fundamental miscarriage of justice would result if the defaulted claim is not heard." *Johnson*, 786 F.3d at 505.

**III.**
**Discussion**

Mr. Bradford raises numerous claims in his amended petition for a writ of habeas corpus. As to some of these claims, the parties dispute whether various procedural hurdles preclude this Court from addressing the claims on their merits. Mr. Bradford maintains that none of the procedural hurdles prevent the Court from reaching the merits of his claims because he has established his actual innocence, which serves to overcome any procedural hurdles his claims face. The Court will first discuss Mr. Bradford's assertion of actual innocence before addressing each of his claims for habeas relief in turn.

**Procedural Hurdles: Actual Innocence**

Mr. Bradford argues that he is actually innocent of the crimes of which he was convicted. To prove his innocence he primarily relies on two expert reports—one of which was presented to the post-conviction court and the other of which is presented for the first time to this Court. This evidence is used to prove that the fire in question began before Mr. Bradford arrived at Ms. Lohr's house.

The undisputed evidence shows that Mr. Bradford was photographed two blocks from Ms. Lohr's house by a bank camera at 6:34:04 a.m. Mr. Bradford reported the fire at 6:35:09 a.m., and firefighters extinguished the fire by 6:43 a.m. Accordingly, if the fire burned for nine minutes or longer, Mr. Bradford could not have set the fire. Mr. Bradford maintains that his experts indisputably show that the fire burned significantly longer than nine minutes.

"The Supreme Court has not recognized a petitioner's right to habeas relief based on a stand-alone claim of actual innocence." *Gladney v. Pollard*, 799 F.3d 889, 895 (7th Cir. 2015); *see McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013); *Herrera v. Collins*, 506 U.S. 390, 404-05 (1993). Instead, "actual innocence may be used as a 'gateway' to excuse procedural defaults

7

that would otherwise bar a federal court from reaching the merits of the underlying claims." *Gladney*, 799 F.3d at 895.  Thus, habeas relief cannot be granted—even if the petitioner has made an adequate showing of actual innocence—unless the petitioner "show[s] an independent constitutional violation."  *Id.*

Mr. Bradford recognizes that there is no stand-alone claim of actual innocence in that he does not seek relief on this basis alone.  He instead attempts to make the requisite showing of actual innocence to excuse procedural defaults that would bar the Court from hearing certain of his claims.  The respondent maintains that the evidence on which Mr. Bradford relies is insufficient to demonstrate that he is actually innocent and thus the claims in question are procedurally defaulted.

The Court need not decide whether Mr. Bradford has submitted sufficient evidence to establish actual innocence.  This is because, at most, establishing as much would permit the Court to address claims that Mr. Bradford has otherwise procedurally defaulted.  *See id.*  Instead of wrestling with the complex question of whether Mr. Bradford's evidence is sufficient to demonstrate actual innocence, judicial efficiency and prudence suggest that the Court should address the allegedly defaulted claim on their merits, given the Court's ultimate conclusion that those claims lack merit.  *See Brown v. Watters*, 599 F.3d 602, 610 (7th Cir. 2010) (holding that because the procedurally defaulted claims lacked merit, the Court could bypass a "difficult" actual innocence claim and address the defaulted claims on the merits); *see also Miller v. Mullin*, 354 F.3d 1288, 1297 (10th Cir. 2004) (declining to address whether certain claims were procedurally defaulted because, "[i]n the interest of judicial economy, . . . the case may be more easily and succinctly affirmed on the merits").  Accordingly, the Court will address Mr. Bradford's claims

for relief below by assuming, without deciding, that he has made the requisite showing of actual innocence such that procedurally defaulted claims may be addressed on the merits.

**Ground I:       Sufficiency of the Evidence**

Mr. Bradford argues that there was insufficient evidence for a reasonable jury to find him guilty of murder and arson beyond a reasonable doubt.  The Court addresses first the respondent's contention that this claim is purely a question of state law that is not cognizable in a federal habeas proceeding before turning to the merits of Mr. Bradford's claim.

*1.       Whether the Claim is Cognizable in a Federal Habeas Proceeding*

The respondent argues that Mr. Bradford's claim before the state courts was an incredible-dubiosity claim under state common law, which is not reviewable in a federal habeas proceeding. It is true that federal habeas courts lack jurisdiction to address purely state-law questions.  *See Lambert v. Davis*, 449 F.3d 774, 778 (7th Cir. 2006); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."). But Mr. Bradford's claim before this Court is not one of incredible dubiosity, it is instead clearly made pursuant to the Due Process Clause of the United States Constitution, [*see* Filing No. 23 at 32], and thus cognizable in this habeas proceeding.

By asserting that Mr. Bradford's claim in state court was only one of incredible dubiosity under state law, the respondent suggests that Mr. Bradford's insufficiency-of-the-evidence claim under the Due Process Clause is procedurally defaulted because it was not raised in state court. But this is simply incorrect.  In Mr. Bradford's brief before the Indiana Supreme Court, he clearly argued that the evidence presented at trial was generally insufficient to support his convictions.

[*See* Filing No. 34-4 at 25-30.]  Indeed, the heading of his argument clearly raises the claim as one made pursuant to the Fifth and Fourteenth Amendments to the United States Constitution.  [*See* Filing No. 34-4 at 25.]  While Mr. Bradford also raised an incredible-dubiosity claim, he clearly did so as an alternative to his federal constitutional claim.  [*See* Filing No. 34-4 at 30 ("[Mr.] Bradford's convictions for murder and arson are supported by insufficient evidence, or that of incredible dubiosity and must therefore be reversed.").]  Thus, Mr. Bradford raised this federal constitutional claim both before the Indiana Supreme Court and raises it against here.  Accordingly, the Court will address the merits of this properly preserved claim.

2.     *Analysis*

Mr. Bradford's insufficiency-of-the-evidence claim is governed by the "rigorous" standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979): "evidence, viewed in the light most favorable to the State, is sufficient to support a conviction so long as any rational trier of fact could find the essential elements of the offense to have been proved beyond a reasonable doubt."  *Jones v. Butler*, 778 F.3d 575, 581 (7th Cir. 2015); *see Monroe v. Davis*, 712 F.3d 1106, 1118-19 (7th Cir. 2013).  Because the Court considers "this claim on collateral review rather than direct appeal, the [AEDPA] imposes an additional layer of defense onto this inquiry: [the Court] may grant relief on this claim only if the [state court] applied the *Jackson* standard unreasonably to the facts of [the petitioner's] case."  *Jones*, 778 F.3d at 581-82.  Therefore, "[f]ederal review of these claims . . . turns on whether the state court provided fair process and engaged in reasoned, good-faith decisionmaking when applying *Jackson*'s 'no rational trier of fact' test."  *Gomez v. Acevedo*, 106 F.3d 192, 199 (7th Cir. 1999).

As stated above, this issue was raised by Mr. Bradford on direct appeal in *Bradford I*.  He argued that the evidence was insufficient for two reasons: (1) there was no evidence placing Mr.

Bradford at Ms. Lohr's house at the time she was killed; and (2) there was insufficient evidence to show that Mr. Bradford could have had the time to set the fire the following morning. *See Bradford I*, 675 N.E.2d at 298. The Indiana Supreme Court began by identifying a standard essentially the same as that set forth in *Jackson*. *Id.* It then went on to explain why neither of Mr. Bradford's arguments showed that this standard was met, reasoning as follows:

> Summarizing the evidence supporting the judgment, we find that on August 2, 1992, Evansville police and firefighters responded to a call made shortly after 6:30 a.m. indicating the possibility of a fatal fire. The defendant, an Evansville Police officer, was at the scene when the firefighters arrived, having made the call himself. The defendant informed the firefighters that he discovered the fire already in progress and that he believed the resident of the house was still inside. The body of the victim was found on her bed. An autopsy revealed that she had been stabbed twenty-one times and had died sometime in the twenty-four hour period preceding the fire. The body of the victim's dog was also found stabbed. Investigators concluded that the fire was the result of arson and that the arsonist had staged a burglary, prior to setting the fire, in order to cover up the murder.

> The State presented evidence that the defendant had an extra-marital affair with the victim for four years prior to her death. The defendant was at the victim's house until approximately 10:20 p.m. of the evening prior to the fire, at which time he left and went to work. The victim's father testified that he spoke with the victim on the telephone from 10:25 p.m. until approximately 11:00 p.m. The State presented evidence that the defendant's whereabouts from 10:20 p.m. until 6:15 a.m. on the night in question were accounted for, except for a significant gap on his activity log from 11:06 p.m. until 12:10 a.m. A witness, Elizabeth Spradley, testified that she passed by the victim's house sometime around 11:00 p.m. and saw a marked Evansville City Police car in the driveway. The defendant accounted for the time between 11:06 p.m. and 11:27 p.m. by testifying that he was patrolling North Main Street and that, during that time, he saw Officers Mittendorf and Thompson at an accident at Main and Michigan, though Officer Mittendorf testified he had not seen the defendant at the accident. The defendant testified that he made a call to central dispatch at 11:27 p.m. to inquire as to whether there were any local arrest warrants out for George Russell, a reputed drug dealer with whom the defendant was familiar and whom the defendant testified he was following at the time in question. George Russell, however, testified that he was not out on the streets at any time that evening. The defendant testified that he was patrolling the northern area of his district during the remaining period—11:27 p.m. to 12:10 a.m.

> The defendant argues that the only evidence potentially relevant to his whereabouts at the time of the murder "came from a witness with more than one theft conviction and was hotly contested" and should thus "be viewed in context." The defendant

asks this Court to reweigh the evidence and assess the credibility of the witness, which we cannot do. The jury, not this Court, judges the credibility of the evidence presented and determines the facts from that evidence. We recognize that conflicting evidence was presented concerning the defendant's whereabouts during the time in question. However, "[t]he jury was not required to believe the defendant's evidence. The jury had every right, as it did here, to believe the State's evidence instead." A rational and reasonable jury could have found that the defendant had sufficient opportunity to commit the crimes.

The defendant also argues that the testimony from Officer Minnis as to whether the defendant had the opportunity to set the fire amounted to an "incredible" or "absurd proposition." An expert for the State testified that the fire began between 6:33 a.m. and 6:36 a.m. The defendant was photographed by a bank camera driving towards the victim's house at 6:34:04. He called the fire department at 6:35:09 from the victim's house. Officer Minnis testified that his own tests revealed that it would be possible to drive from the place where the defendant was photographed to the victim's residence, enter the house, spread a trail of gasoline, light it and exit the house in sixty-five to seventy seconds. Additionally, the State presented testimony from its expert that the defendant's account to the police of what he was able to see upon entering the building was inconsistent with the actual conditions of the fire. As with the defendant's previous claim, he is asking this Court to reweigh the evidence and assess the credibility of the witness, which we cannot do. A rational and reasonable jury could have found that the defendant had sufficient opportunity to start the fire based on the evidence presented.

*Bradford I*, 675 N.E.2d at 298-30 (citations omitted).

Mr. Bradford argues that the Indiana Supreme Court's focus on the jury's resolution of contested facts amounts to a failure understand, and therefore confront, his argument at all. "Even if the jury believed all the State's evidence and theories," says Mr. Bradford, "it still would be impossible for [him] to have set the fire within the 65-second timeframe, rendering the evidence wholly insufficient to support a conviction for arson beyond a reasonable doubt." [Filing No. 23 at 35.] To establish this impossibility, Mr. Bradford argues that Officer Minnis's testimony, on which the Indiana Supreme Court relied, that Mr. Bradford could have set the fire during the 65-second time window failed to account for four additional actions Mr. Bradford would have had to perform within that timeframe had he started the fire. Specifically, Mr. Bradford contends that the following four necessary actions were not accounted for by Officer Minnis's testimony:

· (1) the undisputed evidence establishes that the light in Ms. Lohr's bedroom was on at 12:30 a.m., which is after the only time Mr. Bradford could have killed Ms. Lohr, and thus Mr. Bradford had to shut off the electrical breakers in Ms. Lohr's basement during the 65-second timeframe when he returned to Ms. Lohr's house in the morning to set the fire;

· (2) because Ms. Lohr's gasoline can was used as the accelerant and she kept it outside on the back patio, Mr. Bradford would have had to additionally walk to the back of the house to retrieve it and walk back inside to spread the gasoline;

· (3) the back doors were locked and latched, so Mr. Bradford would have had to re-lock the back door after retrieving the gasoline can;

· (4) Ms. Lohr's dog was beaten, stabbed twice, and had a 4.2% COHb, which means that the dog died after the fire was set and that Mr. Bradford had to have killed it during the 65-second timeframe.

The respondent does not specifically address these four actions that Mr. Bradford contends are determinative. Instead, the respondent asserts only that a witness testified there was a police car at Ms. Lohr's house during the 11:06 p.m. to 12:10 p.m. window when Mr. Bradford's whereabouts were unaccounted for, and thus "[t]he jury was free to believe that [Mr. Bradford] completed some of the actions at that time." [Filing No. 34 at 13.]

In his reply brief, Mr. Bradford emphasizes that the respondent did not address the Indiana Supreme Court's failure to address these additional hypothesized actions. He highlights that the first and fourth actions—perhaps implicitly recognizing that the second and third action could indeed have been completed during the 11:06 p.m. to 12:10 a.m. timeframe—alone demonstrate that Officer Minnis's testimony was insufficient to establish that Mr. Bradford could have set the fire. [See Filing No. 35 at 4-7.] And if this is true, says Mr. Bradford, the Indiana Supreme Court unreasonably determined that Officer Minnis's testimony was sufficient to establish Mr. Bradford's guilt beyond a reasonable doubt.

The Court must begin its analysis by setting forth what evidence can be considered in addressing this claim. With respect to the fourth action—the killing of the dog—Mr. Bradford at

times in his briefing relies on evidence that was first presented during his state court post-conviction proceeding.  Most relevant is the evidence to which Mr. Bradford points showing that the dog was alive when the fire was set because it had a COHb level consistent with the inhalation of significant amounts of smoke.  [*See, e.g.*, Filing No. 23 at 36 n.34; Filing No. 35 at 19.]  While the jury was presented with evidence by way of Ms. Lohr's autopsy report that her COHb level was .2% and the dog's was 4.2%, *see* Trial Tr. 1935-36, Ex. H, no expert testimony or other evidence was provided explaining that the dog therefore must have been alive when the fire was set.  This evidence was only provided by Mr. Bradford's expert Douglas Carpenter during post-conviction proceedings.  *See* PCR Tr. at 188-93, 271.

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).  Accordingly, the evidence that was adduced only at the post-conviction proceedings cannot be considered in determining whether the Indiana Supreme Court unreasonably applied *Jackson*.  The Indiana Supreme Court addressed Mr. Bradford's challenge to the sufficiency of the evidence in *Bradford I*, and thus, like the jury, was not privy to evidence submitted during post-conviction proceedings.  Because § 2254(d)(1) requires this Court to assess the reasonableness of the Indiana Supreme Court's decision, this Court cannot consider evidence that the Indiana Supreme Court itself could not consider.  *See Pinholster*, 131 S. Ct. at 1398 ("Th[e] backward-looking language [of § 2254(d)(1)] requires an examination of the state-court decision *at the time it was made*.") (emphasis added).  Accordingly, Mr. Bradford's reliance on the timing of the dog's death—which

was only presented during the post-conviction proceedings[2]—cannot be used to support his insufficiency of the evidence claim.[3]

Mr. Bradford next relies on evidence regarding the use of Ms. Lohr's gasoline can to start the fire. His reliance on this evidence to argue that the retrieval of the gas can from the back patio and the relocking of the back door must be factored into 65-seconds timeframe is unavailing. There is no evidence—and Mr. Bradford points to none—demonstrating that the gas can necessarily had to be retrieved from outside on the morning the fire was set. This absence of evidence allowed the jury to consider whether Mr. Bradford retrieved it when the murder occurred. But more importantly, the absence of evidence on the point necessarily means that Mr. Bradford fails to demonstrate that no reasonable juror could have found that he had the opportunity to start the fire. Notably, Mr. Bradford implicitly cedes as much in his reply brief by addressing only the first and fourth actions (regarding the dog's death and the electrical breakers) he originally maintained must be factored into the 65-second timeframe. For these reasons, Mr. Bradford's

---

[2] Without additional evidence explaining the meaning of the dog's elevated COHb level, jurors could not be expected to deduce that the dog was alive when the fire was set based merely on the COHb levels set forth in Ms. Lohr's autopsy report. Put differently, a reasonable jury could speculate that a wide variety of factors caused the difference in the COHb levels—or even that such a differential in dogs and humans was normal—absent evidence such as that provided by Mr. Carpenter during post-conviction proceedings..

[3] The Court notes that Mr. Bradford's argument regarding the timing of the dog's death may have been procedurally defaulted. To avoid procedural default, Mr. Bradford had to raise the "specific arguments and operative facts" before the state court. *McNary v. Lemke*, 708 F.3d 905, 919 (7th Cir. 2013); *see Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007). He did not, however, raise the specific argument before the Indiana Supreme Court regarding the timing of the dog's death to support his sufficiency of the evidence claim. Nevertheless, "[p]rocedural default is an affirmative defense and can be waived." *Weddington v. Zatecky*, 721 F.3d 456, 465 (7th Cir. 2013). The respondent did not argue that this particular argument was procedurally defaulted, and thus forfeited this argument. In the end, the Court need not ultimately conclude whether to overlook this forfeiture, *see Perruquet v. Briley*, 390 F.3d 505, 514 (7th Cir. 2004), as the evidence regarding the timing of the dog's death cannot be considered pursuant to *Pinholster*.

reliance on the retrieval of the gasoline can fails to support his position that the Indiana Supreme Court unreasonably applied *Jackson*.

Lastly, Mr. Bradford relies on the evidence that the lights were on in Ms. Lohr's bedroom at 12:30 a.m., which means that he would have had to switch off the electrical breakers in the basement (which the parties do not dispute were switched off) during the 65-second timeframe in the morning when he set the fire. This is the case, says Mr. Bradford, because the undisputed evidence shows that Mr. Bradford had to have committed the murder between 11:06 p.m. and 12:10 a.m.

The specific evidence regarding Ms. Lohr's bedroom lights came from the testimony of Ms. Lohr's next door neighbor, Christopher Jenkins, who was the State's witness. He testified that on the night in question he was at home watching television. At some point later he went upstairs to use the restroom, opened the door and saw that Ms. Lohr's bedroom lights were on. He went back to watching television, and testified as follows regarding the time he saw the lights on:

> Q.     What time would that have been?
>
> A.     Sometime around 12:30 a.m.
>
> Q.     Did you look at the clock?
>
> A.     No, that just sticks out in my mind but I wasn't wearing a watch and could not be exact.

Trial Tr. at 2364.

The difficulty with Mr. Bradford's argument is that it presumes that because this evidence was undisputed, a reasonable jury would have to take it as true. But the *Jackson* standard requires the Court to ask whether "evidence, viewed in the light most favorable to the State, is sufficient to support a conviction so long as any rational trier of fact could find the essential elements of the offense to have been proved beyond a reasonable doubt." *Jones*, 778 F.3d at 581; *see Willard v.*

*Pearson*, 823 F.2d 1141, 1150 (7th Cir. 1987) (holding that, in analyzing a *Jackson* claim, "[t]he federal habeas court must assume that the jury resolved all evidentiary conflicts and found all reasonable inferences in the state's favor").  This standard does not require the Court to take undisputed evidence as true when doing so favors the defendant's version of the case; it requires the Court to assess whether the evidence is sufficient to prove the elements of the offense.  This is critical because the jury could have discredited Mr. Jenkins's testimony, or at least could have thought he was unsure of the precise time he saw the lights on, which would foreclose the need to account for the electrical breakers being switched off in the morning by Mr. Bradford during the 65-second timeframe in question (because, like the gas can, the breakers could have been switched off at the time of the murder when the burglary was staged).[4]  *See Taylor v. Bradley*, 448 F.3d 942, 951 (7th Cir. 2006) (noting that it is reasonable for a jury to "disregard [a witness's] testimony altogether" when there is reason to doubt it).  Had the jury done so, this would leave Officer Minnis's testimony that there was sufficient time for Mr. Bradford to start the fire during the 65-second timeframe.  The Indiana Supreme Court reasonably relied on this testimony as sufficient to prove that Mr. Bradford had the opportunity to set the fire.  *See Bradford I*, 675 N.E.2d at 300.  Accordingly, Mr. Bradford's reliance on Mr. Jenkins's testimony fails to advance his *Jackson* claim.

---

[4] Notably, Mr. Bradford argued in his closing argument to the jury that the fact that the light was on at 12:30 a.m. alone creates reasonable doubt as to his guilt because he could not have had time to start the fire during the 65-second timeframe given that this timeframe had to include running downstairs to turn off the electrical breakers and back upstairs to spread the gasoline and start the fire.  In response, the State argued during its rebuttal closing argument that the jury need not, and indeed should not, credit Mr. Jenkins's testimony as to the precise time he saw Ms. Lohr's bedroom light on because his testimony was equivocal and showed an uncertainty regarding the time he saw the light on.

For these reasons, the evidence on which Mr. Bradford relies does not establish that he is entitled to habeas relief on his insufficiency of the evidence claim.  In reaching this conclusion, one aspect of the Indiana Supreme Court's opinion addressing this claim warrants further discussion—namely, the Indiana Supreme Court failed to confront any of the evidence on which Mr. Bradford currently relies to support his *Jackson* claim.  While Mr. Bradford did not raise the evidence regarding the dog's death to support this claim before the Indiana Supreme Court (as discussed in note 3 above), he clearly raised the issues regarding the necessity of factoring in the gasoline can and the electrical breakers into the 65-second timeframe, [*see* Filing No. 34-6 at 6], yet the Indiana Supreme Court did not confront those specific points in resolving Mr. Bradford's claim.

This failure made review of the reasonableness of the Indiana Supreme Court's application of *Jackson* difficult, but this difficulty does not ultimately undermine the deference the Court owes the Indiana Supreme Court under AEDPA.  The Seventh Circuit has "interpreted *Richter* as instructing federal courts to consider what arguments 'could have supported' a state court decision when the state court 'gave some reasons for an outcome without necessarily displaying all of its reasoning.'" *Kubsch v. Neal*, 800 F.3d 783, 805 (7th Cir. 2015) (quoting *Hanson v. Beth*, 738 F.3d 158, 163-64 (7th Cir. 2013)); *see Jardine v. Dittmann*, 658 F.3d 772, 777 (7th Cir. 2011) ("This court must fill any gaps in the state court's discussion by asking what theories 'could have supported' the state court's conclusion.").  This is the analysis the Court has taken here: the Court discerned grounds that could have supported the Indiana Supreme Court's conclusion that Officer Minnis's testimony was sufficient despite the evidence regarding the bedroom lights and the electrical breakers—*i.e.*, that the jury could have disregarded Mr. Jenkins's testimony—and

concluded that this possibility could have reasonably justified the Indiana Supreme Court's conclusion.

The Court acknowledges that the law in this area is unsettled. *See Kubsch*, 800 F.3d at 806 (discussing the lack of clarity and noting that "AEDPA deference toward state court decisions that reach defensible results for bad or incomplete reasons is not necessarily settled law at this point"). But even under *de novo* review, the reasoning above would still preclude relief for Mr. Bradford on this claim. A reasonable jury could have credited Mr. Minnis's evidence as to the time necessary to set the fire and discredited Mr. Jenkins's testimony that would have required the switching off of the electrical breakers to be included in that timeframe.[5] Therefore, regardless of the standard of review, Mr. Bradford is not entitled to habeas relief on this ground.

**Ground II:     Right to Presence at Trial**

---

[5] Mr. Bradford also contends that the Indiana Supreme Court failed to properly apply the *Jackson* standard because it did not set forth the elements necessary to prove the crimes of arson and murder. But he fails to cite any authority supporting his proposition that this is necessary to reasonably apply the *Jackson* standard. The Indiana Supreme Court clearly identified that the *Jackson* standard governs, even if it did not explicitly cite *Jackson* itself. *See Bradford II*, 675 N.E.2d at 298. It then went on to analyze the elements of these crimes, even if it did so implicitly, and concluded that the evidence was sufficient. Nothing about this approach is contrary to, or involves an unreasonable application of, *Jackson*.

Mr. Bradford further argues that, had the Indiana Supreme Court set forth the elements, it would have "recognized that the State's case against Mr. Bradford was entirely circumstantial." [Filing No. 23 at 39.] But as the Indiana Supreme Court recognized, "circumstantial evidence may form the *entire* basis for a . . . conviction." *Bradford I*, 675 N.E.2d at 299 n.1. Thus not only did the Indiana Supreme Court itself recognize that the evidence against Mr. Bradford was circumstantial, it also correctly recognized that this fact did not preclude a conclusion that the evidence was sufficient to prove his guilt beyond a reasonable doubt. *See United States v. Reyes*, 270 F.3d 1158, 1169 (7th Cir. 2001) ("Circumstantial evidence is of equal probative value to direct evidence and in some cases is even more reliable."). In sum, the fact that the Indiana Supreme Court failed to explicitly set forth the elements of murder and arson, without more, does not make its application of *Jackson* unreasonable.

Mr. Bradford maintains that he was deprived his Sixth Amendment right to be present at every stage of his trial when a hearing was held without him (although his counsel was present) regarding the jury's request to visit the crime scene during its deliberations. The respondent maintains that this claim is procedurally defaulted because Mr. Bradford failed to raise it in state court. As stated above, the Court assumes without deciding that Mr. Bradford has made the requisite showing of actual innocence such that his procedurally defaulted claims, including this one, may be addressed on the merits. *See Brown*, 599 F.3d at 610.[6] Because no state court adjudicated this claim on the merits, this Court reviews the claim *de novo*. *See Villanueva v. Anglin*, 719 F.3d 769, 777 (7th Cir. 2013).

"A criminal defendant's right to be present at every stage of trial is rooted to a large extent in the Confrontation Clause of the Sixth Amendment, *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (citing *Illinois v. Allen*, 397 U.S. 337, 338 (1970)), and is protected to some extent by the due process clause of the Fifth and (in state cases) the Fourteenth Amendment." *United States v. Neff*, 10 F.3d 1321, 1323 (7th Cir. 1993) (citing *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934)). "[A] judge's response to a note from the jury is one of th[e] stages [where a defendant has a right to be present]." *United States v. Coffman*, 94 F.3d 330, 335-36 (7th Cir. 1996) (citing *Rogers v. United States*, 422 U.S. 35, 39 (1975)). "But the infringement of this right does not entitle the defendant to a new trial if it is unlikely to have affected the jury's verdict." *Id.* at 336.

---

[6] The respondent also argues that this claim is untimely because it was first raised in Mr. Bradford amended petition and does not relate back to his initial petition, only the latter of which was timely file within AEDPA's one-year statute of limitations. Like the doctrine of procedural default, AEDPA's statute of limitations is an affirmative defense that "is not jurisdictional." *Holland v. Florida*, 560 U.S. 631, 645 (2010). Therefore, given that the Court concludes that Mr. Bradford's claim ultimately lack merit, it more prudent to proceed directly to the merits of the claim and not resolve the statute of limitations defense.

The Court agrees with the respondent that Mr. Bradford was not prejudiced by the fact that he was not present when the trial court considered, along with both parties' counsel, the jury's request during deliberations to make a second visit to the crime scene.[7]  Although Mr. Bradford was not at the hearing regarding the jury's request, he was ably represented by counsel at the hearing, who did not object to the jury visiting the crime scene.  The jury had already visited the crime scene once, so there is no reason to think that even if Mr. Bradford had been present at the hearing he would have objected, let alone changed the hearing's ultimate result.

Mr. Bradford makes much of the fact that some jurors conducted unauthorized experiments during the second visit to the crime scene, and relies on this fact to establish prejudice.  [*See* Filing No. 23 at 43.]  But the trial court explicitly instructed the jurors that they could not conduct experiments during their second visit to the crime scene.  Mr. Bradford's non-presence at the hearing had no bearing on whether the jurors ultimately followed this instruction, and thus any violation of his right to be present during this hearing could not have caused the prejudice on which he relies.

Whether the jurors' alleged experiments violated Mr. Bradford's constitutional rights is an independent claim addressed below.  But whether they did, and any prejudice it may have caused, was not a result of Mr. Bradford's absence at the hearing in question.[8]  Accordingly, Mr. Bradford

---

[7] The respondent argues that the record does not definitively establish that Mr. Bradford was not present at this stage of the proceeding, and thus his claim fails on this basis.  [*See* Filing No. 34 at 23.]  Because the Court concludes that Mr. Bradford was not prejudiced by his alleged failure to be presenting during this proceeding, the Court assumes without deciding that he was not present.

[8] In the alternative, Mr. Bradford argues that this constitutional error is a "structural error," thus he need not make a specific showing of prejudice.  [Filing No. 23 at 42.]  The Supreme Court has held that on one "end of the spectrum of constitutional errors lie structural defects in the constitution of the trial mechanism, which defy analysis by harmless-error standards," and these types of errors "require[] automatic reversal of the conviction because they infect the entire trial process."  *Brecht v. Anderson*, 507 U.S. 619, 629-30 (1993).  An example of a structural error is

cannot establish that his absence during this hearing in any way affected the jury's verdict, *see Coffman*, 94 F.3d at 336, and thus he is not entitled to relief on this claim.

### Ground III:   Right to Conviction Only on Evidence Presented at Trial

Mr. Bradford argues that his Sixth Amendment rights were violated because jurors relied on their own experiments at the crime scene to convict him.  The Sixth Amendment guarantees that "the accused shall enjoy the right to a . . . trial, by an impartial jury . . . (and) be confronted with the witnesses against him."  *Parker v. Gladden*, 385 U.S. 363, 364 (1966); *see Turner v. Louisiana*, 379 U.S. 466, 472-73 (1986).  "The corollary of this [right] is that the jury, in reaching its verdict, has a duty to consider only that evidence which is presented in open court, and not that which comes from outside sources."  *United States v. Neff*, 10 F.3d 1321, 1326 (7th Cir. 1993); *see Parker*, 385 U.S. at 364 ("[T]he evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.") (citation and quotation marks omitted). "Should a jury base its verdict in whole or in part on evidence derived from extraneous sources, then to the degree it has done so, the defendant will have effectively lost the rights of confrontation, cross-examination, and of assistance of counsel—in other words, the guarantee of trial by jury." *Neff*, 10 F.3d at 1326.  A defendant's Sixth Amendment right may be violated if "the jury conducts experiments based on information obtained outside of the trial court."  *Kurina v. Thieret*, 853 F.2d 1409, 1414 (7th Cir. 1988).

---

the "deprivation of the right to counsel."  *Id.* at 629.  But the Seventh Circuit has made clear that the defendant's right to be present at every stage of the trial is subject to harmless-error analysis, *see Coffman*, 94 F.3d at 335-36, and Mr. Bradford has not cited any authority to the contrary. Therefore, this error is not structural, and the harmless-error analysis applies.

### 1.    *Clearly Established Federal Law*

The respondent argues that, while the Supreme Court has clearly held that the Sixth Amendment requires evidence to be presented on the witness stand in open court, the Supreme Court has not held that the reenactment of a crime during a visit to a crime scene based on the evidence at trial is unconstitutional; therefore, relief under § 2254(d)(1) is unavailable because there is no clearly established federal law, as determined by the Supreme Court, that the state court unreasonably applied.  Mr. Bradford replies that the facts of this case and the Supreme Court case announcing the prevailing federal law need not be identical for the legal principle announced to be clearly established law.

As stated above, a writ of habeas corpus may not be granted unless the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied."  *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (citation and quotation marks omitted).  "Nor does AEDPA prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts 'different from those of the case in which the principle was announced.'"  *Id.* (quoting *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003)).

The Supreme Court's decision in *Panetti* makes clear that the respondent's position here is untenable.  The respondent essentially argues that there must be a Supreme Court case involving the same facts serving as the basis for Mr. Bradford's claim here—the reenactment of a crime during a jury's visit to the crime scene—for the law to be clearly established.  But even the respondent recognizes that the general Sixth Amendment principle—that "the evidence developed

against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel," *Parker*, 385 U.S. at 364—is clearly established. *See also Fletcher v. McKee*, 355 Fed. Appx. 935, 937 (6th Cir. 2009) ("[U]nder clearly established federal law [as required by § 2254(d)(1)], jury exposure to extrinsic evidence or other extraneous influence violates a defendant's Sixth Amendment rights."). And AEDPA does not prohibit a habeas court from concluding that the state court unreasonably applied a general principle, such as this one, to a different set of facts. *See Panetti*, 551 U.S. at 953 ("[AEDPA] recognizes . . . that even a general standard may be applied in an unreasonable manner."); *Winston v. Boatwright*, 649 F.3d 618, 625 (7th Cir. 2011) ("[Under AEDPA], courts are not prohibited from finding an application of a legal *principle* unreasonable when it involves different *facts* from those of the case that announced the principle.").

Accordingly, Mr. Bradford has properly identified clearly established federal law as recognized by the Supreme Court that serves as the basis for his claim, and the Court will therefore turn to whether the state court unreasonably applied that law in adjudicating Mr. Bradford's Sixth Amendment claim.

### 2.    *Merits*

The Indiana Supreme Court addressed Mr. Bradford's claim on the merits, reasoning as follows:

> The defendant also contends that the jury conducted improper experiments during deliberations which enabled them to consider evidence not presented at trial and therefore violated his right to a fair trial. During the trial, upon motion of the State and without objection by the defense, the jury was taken to the scene of the crime and permitted to view the inside of the house in which the victim's body had been found. Record at 2914. Later, after its deliberations had begun, the jury requested permission to revisit the scene of the fire and to review both the inside and the outside of the house. There were no objections from the State nor the defense, and the trial court granted the jury's request, with some restrictions. The jurors had requested permission to fill an empty gas can with water to determine how fast the

gas can could be emptied. The trial judge rejected this request, stating, "I cannot allow you to take a gas can and conduct your own experiments. That is not evidence. You cannot conduct your own experiments and make up your own evidence...." Supp. Record at 245. The trial judge granted permission for the jurors to talk to each other about what they were viewing while inside the house, but would not permit such discussion outside the house or in the presence of the bailiff.

Following the trial, three jurors signed affidavits for the defense which stated:

> I recall that the jury conducted experiments by walking through the motions of pouring gasoline out of a[n imaginary] can inside the home and timing the amount of time this took as well as the amount of time for an individual to crawl from the front door to the bedroom and back to the front door.

Supp. Record at 242; 243; 282. Two different jurors signed affidavits for the State stating that, during their second visit to the crime scene, "the jury followed Judge Young's order by not conducting any experiments, testing, or timing simulations that were not in evidence." Supp. Record at 401; 564.

In *Kennedy v. State*, 578 N.E.2d 633 (Ind. 1991), during deliberations two jurors of height and build similar to the defendant tried on clothing introduced in evidence. We held that their actions constituted a permissible examination of the evidence and not an improper extrajudicial experiment. We noted the analysis of the Sixth Circuit in *In re Beverly Hills Fire Litigation*, 695 F.2d 207 (6th Cir. 1982), that "an experiment by the jury is improper where it amounts to additional evidence supplementary to that introduced during the trial." *Kennedy*, 578 N.E.2d at 641. The State argues that no outside influence was brought into the jury deliberations and that the jurors were merely examining the crime scene, thus making use of matters submitted to them during the trial for their consideration.

At trial, before the jury view of the crime scene, the State introduced evidence relating to whether the defendant had enough time to start the fire. Specifically, Detective Minnis testified that he conducted experiments timing exactly how long it took him to pull into the victim's driveway, walk to the victim's front door (twelve seconds), crawl to the bedroom and back (twelve seconds), walk to the bedroom, pour gasoline in the room making two or three passes around the bed, walk out of the bedroom, light a match and throw it in, and then walk back to the front door (thirty-five seconds). We find that the jury's authorized visit and deliberations at the premises where the crime occurred was not improper.

*Bradford I*, 675 N.E.2d at 304.

Mr. Bradford argues that the jurors' activities during the crime scene visit amount to "an experiment that is not merely examining the evidence already presented, but recreating the

25

scenario in order to develop their own evidence," which is "improper" because it "resulted in additional evidence supplementary to that introduced at trial." [Filing No. 23 at 45.]  The Indiana Supreme Court's resolution of this claim was unreasonable, says Mr. Bradford, because contrary to its holding, the jurors' actions went beyond the recreation of Officer Minnis's testimony.  For example, Mr. Bradford points out that "there was no evidence as to how much gasoline was poured in the house." [Filing No. 23 at 46.]  The respondent contends that the Indiana Supreme Court reasonably adjudicated this claim because jurors are allowed to reenact a crime using common sense and ordinary and un-inflammatory props." [Filing No. 34 at 19.]

The Court cannot conclude that the Indiana Supreme Court unreasonably applied clearly established federal law.  In reaching this decision, the Court is guided by other courts who have applied the legal principle at issue to analogous factual scenarios.  The Seventh Circuit has held that "[j]urors must be given enough latitude in their deliberations to permit them to use common experience and illustrations in reaching their verdict."  *Kurina*, 853 F.2d at 1414 (citation and quotation marks omitted).  Applying this standard, the Seventh Circuit in *Kurina* concluded that it did not violate the defendant's Sixth Amendment rights for the jury to use a cardboard replica of a knife, which was the murder weapon, to test the defendant's testimony that a left handed person such as himself could not have committed the crime, since the victims were stabbed by a right-handed assailant.  *Id.*  The Court reasoned that a defendant's Sixth Amendment rights "may be interfered with when the jury conducts experiments based on information obtained outside of the trial court," but that "no such experiments took place here."  *Id.*

The Indiana Supreme Court viewed the jurors' conduct as mere recreation of Officer Minnis's trial testimony as to how long it would have taken Mr. Bradford to start the fire.  This is analogous to *Kurina* in that the jurors recreated an event about which there was evidence presented,

even though they did not have every detail of information necessary to recreate the crime with perfect accuracy.  Mr. Bradford is correct that that the jurors did not know precisely how much gasoline was poured, but neither did Officer Minnis.  In this sense, the jurors were arguably adhering to the evidence adduced at trial—Officer Minnis's testimony—along with "common experience and illustrations." *Id.*; *see also Bogle v. Galaza*, 38 Fed. Appx. 437, 438 (9th Cir. 2002) (holding that "the jury's actions did not constitute an impermissible jury experiment or the consideration of extrinsic evidence, because a jury is permitted to examine all pieces of evidence carefully, . . . and to reenact the crime using the evidence before it"); *United States v. Avery*, 717 F.2d 1020, 1026 (6th Cir. 1983) (holding that "[e]ven assuming the jury did recreate the defendant's actions" to test if he could place certain materials in a crawl space in three minutes, this was permissible because the jury was not "exposed to any extraneous materials during deliberations" and jurors are permitted "to use common experiences and illustrations in reaching their verdict").

Notably, this is not a case where a single juror conducted experiments outside the presence of the other jury members when deliberations were not ongoing and then reported the results back once deliberations resumed.  *See Doan v. Brigano*, 237 F.3d 722, 733 (6th Cir. 2001) ("[W]hat triggers concerns of a constitutional dimension[] is the fact that Juror A conducted an out-of-court experiment [put lipstick on her arm to simulate a bruise and evaluated whether such a "bruise" could be seen in a dimly lit room as a means to test the reliability of trial testimony] and reported her findings to the jury in the manner of an expert witness."), *overruled on other grounds by Wiggins v. Smith*, 539 U.S. 510 (2003); *cf. Fletcher v. McKee*, 355 Fed. Appx. 935, 939 (6th Cir. 2009) (agreeing with the district court's distinguishing of *Doan* and reasoning that the juror's reenactment in the jury room using a gun admitted into evidence and testimony regarding the firing

of the gun did not create extrinsic evidence as it was part of the juror's private, internal deliberations). Here, the jury's visit to the crime scene was permitted by the trial judge with the agreement of both parties. Thus, any recreations done by the jurors at the crime scene were done in what was the equivalent of the jury room with all other jurors present.[9]

Given the foregoing, Mr. Bradford cannot establish that the Indiana Supreme Court's decision "involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). A state court's decision does not constitute an "unreasonable application" of clearly established federal law merely because the decision is "erroneous[] or incorrect[]"; it "must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). Thus, this Court's responsibility on habeas review is not to determine whether the Indiana Supreme Court's resolution of this claim was correct. The Court's focus is whether the resolution of the issue derived from an unreasonable application of federal law. Although not controlling, the foregoing cases show that many analogous situations have been deemed no violation of a defendant's Sixth Amendment rights. Like those cases, the Indiana Supreme Court concluded that the jury's conduct did not supplement the evidence presented at trial but were merely deliberations over the evidence presented—*i.e.*, Officer Minnis's testimony.[10]   *See*

---

[9] To the extent that Mr. Bradford contends that the Indiana Supreme Court made an unreasonable determination of the facts in light of the evidence, *see* 28 U.S.C. § 2254(d)(2), the Court does not construe the Indiana Supreme Court's resolution of this claim susceptible to such a challenge. The Indiana Supreme Court did not make a finding of fact as to the jurors' affidavit; instead, it seemingly took the affidavits on which Mr. Bradford relies as true and reasoned that the jurors' actions at the crime scene did not amount to improper extrinsic evidence. Even if such a challenge were available, the Court finds nothing unreasonable about the Indiana Supreme Court's underlying factual determinations, as they were based on the same jurors' affidavits on which Mr. Bradford relies.

[10] Notably, one juror signed an affidavit that went into significant details regarding the jury's second visit to the crime scene. He stated, "[T]he jury interpreted [the trial judge's] order to mean we were not to conduct any experiments that had not been testified to or were not introduced in

*Bradford I*, 675 N.E.2d at 304.  While some courts might take a different view of whether this application of federal law was correct, the Court certainly concludes was not an unreasonable one. Accordingly, Mr. Bradford is not entitled to habeas relief on this ground.

**Ground IV:   Ineffective Assistance of Trial Counsel**

Mr. Bradford argues that his trial counsel rendered ineffective assistance for three distinct reasons.  The Court will begin by setting forth the standards governing such a claim, before addressing each of the three specific claims in turn.

A defendant has a right under the Sixth Amendment to effective assistance of counsel.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  For a petitioner to establish that "counsel's assistance was so defective as to require reversal," he must make two showings: (1) that counsel rendered deficient performance that (2) prejudiced the petitioner.  *Id.*  With respect to the performance requirement, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 688).  "[T]o establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  *Id.* at 534 (quoting *Strickland*, 466 U.S. at 694).

When the deferential AEDPA standard is applied to a *Strickland* claim, the following calculus emerges:

> Establishing that a state court's application of *Strickland* was unreasonable under §
> 2254(d) is . . . difficult.  The standards created by *Strickland* and § 2254(d) are both
> "highly deferential," [*Strickland*] at 689, 104 S. Ct. 2052; *Lindh v. Murphy*, 521
> U.S. 320, 333, n.7 (1997), and when the two apply in tandem, review is "doubly"

---

evidence.  The jury followed this order by only discussing and doing simulations that were testified to at trial.  They jury also followed [the] order in that we were never given or used a gas can at the [crime scene]."  Supp. R. at 399.

so, *Knowles*, 556 U.S. at 123.  The *Strickland* standard is a general one, so the range of reasonable applications is substantial.  556 U.S., at 123.  Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at 105.

The Indiana Court of Appeals rejected Mr. Bradford's ineffective assistance of trial counsel claims on the merits.  *See Bradford II*, 988 N.E.2d at 1201.  In doing so, it applied the well-known *Strickland* standard, and thus its decision is reviewed through the lens of AEDPA.

### 1.    Failure to Secure an Adequate Expert

Mr. Bradford argues that his counsel provided ineffective assistance by failing to secure an adequate fire sciences expert to testify on his behalf at trial.  The Indiana Court of Appeals addressed this claim in *Bradford II* as follows:

Bradford's attorneys hired Davie well in advance of trial. Davie had a degree in chemistry and had attended numerous specialized seminars in fire investigation. He co-owned a fire investigation business and had analyzed "approximately 1700 fire/explosion scenes to determine the causes and origin of fire." Trial Tr. p. 3043. Davie was a member and former officer of numerous national and state fire investigation associations. He had published seven articles, lectured frequently at law enforcement and other fire investigation organizations, and testified in trials. Bradford's attorneys thought Davie's testimony would have a strong impact upon the jury because he had testified for the State "over twenty times" and had always helped to obtain convictions. PCR Tr. p. 33. Until Bradford's case, Davie had never testified for the defense in a criminal matter. Trial Tr. p. 3260. Indeed, one of the State's experts testified at trial that Davie had a good reputation in the fire investigation community. *Id.* at 3835. These factors demonstrate the attorneys' selection of Davie was not deficient performance.

Bradford says Davie made use of an obsolete standard in determining how long it took for the fire to burn through Lohr's bedroom door, and trial counsel should have hired a different expert who would not have used that standard. However, the National Fire Protection Agency did not discard the burn-through standard used by Davie until early 1992, only a few months before trial. PCR Tr. p. 197. We cannot say that Bradford's attorneys were required to be as well informed in fire investigation science as the experts and as such rendered deficient performance by being unaware of this change and by continuing to use Davie's services.

30

Next, Bradford notes that Davie, unlike Carpenter, was not an engineer by training and therefore was unqualified to perform the work that Carpenter did. However, Davie was clearly qualified to discuss fire investigation procedures and the potential causes and characteristics of fire. Bradford's counsel did not perform deficiently merely because another expert may have provided a different perspective based on different training. *See Ward*, 969 N.E.2d at 65.

Finally, Bradford contends that someone had once challenged Davie's methods in a written response to one of Davie's published articles. We cannot say that Bradford's attorneys acted unreasonably in hiring Davie merely because his methods were questioned in writing once over the course of his lengthy career.

*Bradford II*, 988 N.E.2d at 1203-04.

In arguing that the Indiana Court of Appeals unreasonably applied *Strickland*, Mr. Bradford focuses on its resolution of whether his trial counsel rendered deficient performance in utilizing an expert that used a standard to measure the duration of the fire that the National Fire Protection Agency ("NFPA") had deemed unreliable.   [*See* Filing No. 23 at 50-51.]   Specifically, Mr. Bradford asserts that his "trial counsel had a duty to familiarize himself with NFPA 921 and investigate the current state of fire investigations in relations to Mr. Davie's opinions." [Filing No. 23 at 51.]

The Court begins with the general principle that trial counsel has a duty "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.  Mr. Bradford's trial counsel investigated whether a fire investigation expert would be beneficial and decided that one would; trial counsel hired Mr. Davie "well in advance of trial," *Bradford II*, 988 N.E.2d at 1203, and he testified at length during Mr. Bradford's trial.  As set forth by the Indiana Court of Appeals (the factual predicates of which are unchallenged by Mr. Bradford), Mr. Davie was a well-qualified expert based on his past experience: he had a degree in chemistry, co-owned a fire investigated business, had analyzed over 1700 fire/explosion scenes to determine causes and origin, had testified for the State more than

twenty times to help the State obtain convictions, had—according to one of the State's witnesses—a good reputation in the fire investigative community, and had never testified on behalf of a defendant until Mr. Bradford's trial, which likely garnered him a significant amount of credibility with the jury. *Id.* at 1203-04.

Mr. Bradford's challenge before this Court focuses not on these qualifications but on Mr. Davie's use of a technique to measure the duration of a fire that the NFPA deemed unreliable four months before trial. The Indiana Court of Appeals rejected Mr. Bradford's contention that trial counsel was "required to be as well informed in fire investigation science as the experts and as such rendered deficient performance by being unaware of this change and by continuing to use [Mr.] Davie's services." *Id.* at 1204. This application of *Strickland*'s performance prong does not strike the Court as unreasonable. Trial counsel selected a qualified expert to testify as to the fire's duration, and there is no authority supporting Mr. Bradford's position that trial counsel must be as current on the relevant investigative techniques as the expert.

The lone authority on which Mr. Bradford relies is the Sixth Circuit's grant of habeas relief in *Richey v. Bradshaw*, 498 F.3d 344 (6th Cir. 2007). In *Richey*, the defendant's counsel retained an expert to investigate whether the State's arson theory was subject to attack, but otherwise "appeared unconcerned about the State's scientific evidence from the very beginning." *Id.* at 362. Specifically, counsel authorized the expert to begin working only two months before trial, failed to know what the expert was doing to test the State's evidence (trial counsel found out that the expert did not perform independent testing "until well after trial"), "failed to work with the expert to understand the basics of the science involved," and "failed to inquire about why [the] expert agreed with the State." *Id.* The Sixth Circuit concluded that counsel's performance "cannot be deemed effective where he hires an expert consultant and then either willfully or negligently keeps

32

himself in the dark about what that expert is doing, and what the basis for the expert's opinion is." *Id.* at 362-63. The crucial factor, reasoned the Sixth Circuit, was "that [trial counsel] had a duty to know enough to make a reasoned determination about whether he should abandon a possible defense based on his expert's opinion," but failed to do so. *Id.* at 363.

Unlike in *Richey*, there is no evidence here that trial counsel was not imminently involved in the selection of Mr. Davie as an expert. He was selected "well before trial," and before the NFPA determined that the technique on which he utilized was "unreliable." *Bradford II*, 988 N.E.2d at 1203. Nor, as Mr. Bradford asserts, does *Richey* support his proposition that "Mr. Bradford's trial counsel had a duty to familiarize himself with NFPA 921 and investigate the current state of fire investigations in relation to Mr. Davie's opinions." [Filing No. 23 at 51.] The Sixth Circuit in *Richey* merely concluded that a lawyer is ineffective when "he hires an expert consultant and then either willfully or negligently keeps himself in the dark about what that expert is doing, and what the basis for the expert's opinion is." *Richey*, 498 F.3d at 362-63; *see also Thompson v. United States*, 436 Fed. Appx. 669, 674 (7th Cir. 2011) (noting that the expert in *Richey* "did next to nothing to determine if the state's arson conclusion was subject to attack"). Mr. Bradford seeks to impose an additional requirement on counsel—namely, to not only understand the basis for the expert's opinion when hired, but to constantly keep up to date on the latest developments in the expert's field as trial approaches to ensure that the expert is aware of, and utilizing, them.

While this some other court might conclude that such a requirement would be necessary "under prevailing professional norms," *Wiggins*, 539 U.S. at 521, this Court does not conclude that the Indiana Court of Appeals was unreasonable for reaching the contrary conclusion. "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is

whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 562 U.S. at 105. The Indiana Court of Appeals provided a reasonable argument that Mr. Bradford's counsel rendered adequate performance by selecting an expert who, at the time of selection, was well-qualified and utilizing techniques that appeared to be both acceptable and beneficial to Mr. Bradford's position in the case, and thus § 2254(d) prevents this Court from disturbing that conclusion. Accordingly, the Court need not assess *Strickland's* prejudice prong, and must deny Mr. Bradford relief on this claim.

### 2. *Failure to Impeach Witness George Russell*

Mr. Bradford argues that his trial counsel was ineffective for failing to impeach George Russell with a prior robbery conviction and a prior inconsistent statement. The Indiana Court of Appeals resolved this claim against Mr. Bradford, reasoning as follows:

> At trial, the State presented testimony from George Russell that he was at his brother's house on the night of Lohr's murder. This testimony contradicted Bradford's activity log, which showed that Bradford asked dispatch for information on Russell at 11:26 p.m., indicating he had seen Russell out and about at that time.

> Bradford first argues that his counsel should have impeached Russell with a 1986 robbery conviction. To be sure, at the time of Bradford's trial a conviction of robbery was admissible to attack the credibility of an adult witness. *See Storey v. State*, 552 N.E.2d 477, 481 (Ind. 1990) (infamous crimes, including robbery, may be used for impeachment).

> We cannot say that Bradford was prejudiced by his attorneys' failure to inform the jury of Russell's robbery conviction. The conviction was over six years old at the time of trial and was committed when Russell was sixteen, and jurors may have concluded that it was too remote in time to provide insight into his character. Furthermore, Russell admitted under cross-examination that Bradford had arrested him in the past, and such an admission seems more damaging to Russell's credibility than an old conviction because the arrest provided a more personal motive for Russell to lie to harm Bradford. Moreover, Bradford's alleged sighting of Russell was only one of the gaps in Bradford's activity log, and the jury could have concluded that even if Russell was not credible due to a past conviction, there was still ample time for Bradford to have murdered Lohr over the course of the evening.

Next, Bradford argues that his attorneys failed to adequately impeach Russell with a prior inconsistent statement. During a pretrial deposition, an officer who had interviewed Russell said that Russell told him he had been "cruising around" that evening. PCR Tr. Vol. III, Petitioner's Ex. 20, p. 7. Bradford acknowledges that his counsel attempted to generally impeach Russell as to his whereabouts that night, but he says his counsel should have impeached him with the officer's deposition testimony.

At trial, Bradford's counsel impeached Russell as follows:

Q: On the evening of August 1st, were you out driving?

A: No.

Q: You were nowhere out at all on August 1st?

A: No.

. . .

Q: Do you remember talking to an investigator in this case earlier?

A: Hm-hm.

Q: Is he here in the courtroom today? See the man back there in the gray hair?

A: Yeah.

Q: Do you remember talking to him before?

A: Yeah.

Q: Did you ever tell him that that night you were close to downtown driving?

A: Excu [sic] . . . I didn't understand you.

Q: Did you ever tell him that you were close to downtown driving that night?

A: No.

Q: You never told him that?

A: No.

Trial Tr. pp. 1801–03. Thus, Bradford's counsel indicated to the jury that Russell was contradicting his past statement to the police, a direct challenge to Russell's

35

credibility on this point. His counsel could have reasonably decided that using the officer's deposition testimony to further impeach Russell would belabor the point and distract the jury during a protracted trial. Furthermore, Russell's trial testimony and the officer's deposition testimony are not necessarily contradictory, because Russell testified at trial that he had driven to his brother's house earlier in the night.

Bradford cites *Ellyson v. State*, 603 N.E.2d 1369 (Ind. Ct. App. 1992), in which a panel of this Court concluded that trial counsel was ineffective for failure to lay the groundwork to impeach a witness with prior inconsistent statements. By contrast, Bradford's counsel did follow the procedures for impeachment and provided a basis for the jury to infer that Russell was contradicting a past statement to law enforcement. The post-conviction court did not err on this issue.

*Bradford II*, 988 N.E.2d at 1201-02.

The Court will address the two bases for impeachment raised by Mr. Bradford and discussed by the Indiana Court of Appeals in turn.  First, the Indiana Court of Appeals concluded that trial counsel's failure to impeach Mr. Russell with his 1986 robbery conviction did not prejudice Mr. Bradford.   Mr. Bradford argues that this was an unreasonable application of *Strickland* because the case against him was "entirely circumstantial and not overwhelming," so the use of a prior felony conviction to impeach Mr. Bradford—whose whereabouts otherwise went unimpeached and who directly contradicted Mr. Bradford's alibi—would likely have changed the outcome of the case.  [Filing No. 23 at 54.]

"[T]o establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 694).  The Indiana Court of Appeals determined that trial counsel's failure impeach Mr. Russell with his 1986 robbery conviction did not prejudice Mr. Bradford because, among other reasons, "Russell admitted under cross-examination that Bradford had arrested him in the past, and such an admission seems more damaging to Russell's credibility than an old conviction because the arrest provided a more personal motive for Russell to lie to harm Bradford." *Bradford II*, 988 N.E.2d at 1202.  The Court

finds this basis for decision constitutes a reasonable resolution of Mr. Bradford's claim on *Strickland*'s prejudice prong. The evidence that Mr. Russell was previously arrested by Mr. Bradford not only overlaps with the unoffered evidence that Mr. Russell was previously convicted of robbery in that both convey that Mr. Russell has a history of criminal activity, but as the Indiana Court of Appeals reasoned, Mr. Russell's previous arrest by Ms. Bradford is even more damaging to Mr. Russell's credibility because it provides "a more personal motive" for Mr. Russell to offer false testimony at Mr. Bradford's trial. *Id.* Thus, given that similar—and more compelling— evidence was admitted at trial, it was reasonable for the Indiana Court of Appeals to conclude that Mr. Bradford's trial counsel's failure to impeach Mr. Russell with his prior robbery conviction did not prejudice Mr. Bradford.

Second, the Indiana Court of Appeals concluded that Mr. Bradford's trial counsel did not render deficient performance by allegedly failing to adequately impeach Mr. Russell with a prior inconsistent statement that he was "cruising around" that night. Mr. Bradford failed to specifically address what about the Indiana Court of Appeals resolution of this claim was unreasonable, [*see* Filing No. 23 at 53-54; Filing No. 35 at 24-25], and the Court cannot conclude that it was. The Indiana Court of Appeals correctly observed that "Bradford's counsel indicated to the jury that Russell was contradicting his past statement to the police, a direct challenge to Russell's credibility on this point." *Bradford II*, 988 N.E.2d at 1202.

Perhaps more important, however, is the Indiana Court of Appeals recognition that "Russell's trial testimony and the officer's deposition testimony are not necessarily contradictory, because Russell testified at trial that he had driven to his brother's house earlier in the night." *Id.* A comparison of Mr. Russell's trial testimony and Officer DeYoung's deposition testimony bears this out. At trial, Mr. Russell testified that he drove to his brother's house "between 8:00 and 9:00"

and remained there "[a]ll night."  Trial Tr. at 1803.  Officer DeYoung testified in his pre-trial

deposition, in relevant part, as follows:

> Q.      . . . You interviewed George Russell on August 24th . . . is that correct?
>
> A.      Correct.
>
> . . .
>
> Q.      And other than what's in your supplemental report, did he tell you anything else?
>
> A.      I asked if he had been stopped by the police that night and he said, no, but he's always being hassled by the cops and I asked if he could remember specific locations where [he] had been at, he said just cruising around.
>
> Q.      Did you ask him where he was at 11:26?
>
> A.      No, I did not at that time, specifically.  No.
>
> Q.      Did you ask him that later?
>
> A.      I believe Detective Minnis did when he took his statement.

PCR Tr., Pet's Ex. 20 at 7.  Thus, Mr. Russell's testimony reveals that he drove to his brother's

house between 8:00 and 9:00 p.m., while Officer DeYoung testified that Mr. Russell said he was

"cruising around" at some undetermined time that night.  As the Indiana Court of Appeals

reasoned, these statements are not "necessarily contradictory."  *Bradford II*, 988 N.E.2d at 1202.

Officer DeYoung could not testify as to the time Mr. Russell was "cruising around."  It could have

been before the 8:00 to 9:00 p.m. window, or it could have referred to during that window, and

thus it does not "necessarily contradict" Mr. Russell's testimony.  Moreover, to the extent Officer

DeYoung's statement contradicts Mr. Russell's testimony that he was not "out driving" the

evening of August 1, again, as recognized by the Indiana Court of Appeals, that statement is contradicted by Mr. Russell's own testimony that he went to his brother's house that night.[11]

In sum, the Indiana Court of Appeals reasonably concluded that Mr. Russell's testimony and his statements to Officer DeYoung were not necessarily contradictory, and thus it was not deficient performance to fail to introduce Officer DeYoung's deposition testimony regarding Mr. Russell's statement into evidence. Given that Mr. Bradford's counsel had already created the inference for the jury that Mr. Russell's had previously testified contrary to his trial testimony, and that the actual impeachment value of Officer DeYoung's testimony was tenuous as it was not necessarily contradictory, it was reasonable for the Indiana Court of Appeals to conclude that Mr. Bradford's "counsel could have reasonably decided that using the officer's deposition testimony to further impeach Russell would belabor the point and distract the jury during a protracted trial." *Bradford II*, 988 N.E.2d at 1202. For these reasons, Mr. Bradford is not entitled to habeas relief on this ground.

### 3.     Failure to Object to Jury Instruction 14

Mr. Bradford's final ineffective assistance of trial counsel claim is predicated on his trial counsel's failure to object to Jury Instruction 14. The Indiana Court of Appeals set forth the basis for this claim and addressed it on the merits as follows:

In Bradford's trial, Final Instruction Fourteen provided:

> The credibility of a witness may be attacked by introducing evidence that on some former occasion the witness made a statement, or made a written statement in former testimony, testified or acted in a manner inconsistent with his or her testimony in this case. It is inconsistent if the witness denied making the prior statement or if the witness could not remember making the prior statement.

---

[11] The Court also notes that impeachment of Russell with either Officer DeYoung's deposition testimony or notes would be problematic, because they contained Officer DeYoung's versions of s prior statement of Mr. Russell. Neither was an actual statement made by Mr. Russell.

> Evidence of this kind may be considered by you in deciding the weight to be given to the testimony of that witness as well as substantive evidence of the guilt of the defendant.

Trial Tr. p. 213. The parties agree that this instruction was taken from pattern jury instructions regularly employed at the time of trial. Bradford notes that in *Modesitt v. State*, 578 N.E.2d 649, 653-54 (Ind. 1991), the Indiana Supreme Court held prior statements could no longer be considered as substantive evidence of guilt unless: (1) the prior inconsistent statement was given under oath; (2) the prior statement was consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive; or (3) the statement is one of identification of a person made after perceiving the person.

It appears that Final Instruction Fourteen did not conform to the holding in *Modesitt*. Consequently, had Bradford's counsel objected to the instruction on that basis, it would have been sustained.

As for possible prejudice, Bradford makes two points. First, he claims the State improperly impeached Davie with his deposition (asking more or less, "you told me in your deposition it could have been a seven-minute fire, didn't you?"), and the jury therefore could have improperly considered the "inconsistent" deposition as substantive evidence. Of course, in *Modesitt* the Court held that prior statements under oath, such as a deposition, are admissible as substantive evidence. Thus, the jury could have properly considered inconsistent statements in Davie's deposition as substantive evidence, and Bradford suffered no prejudice from the instruction in this regard.

Second, Bradford notes that during trial his wife Dawn denied that Bradford's partner Hildenbrant asked her whether she thought Bradford committed the crimes. She further denied that she answered Hildenbrant's question by saying: "I don't know, he's been acting strange lately, he's crazy." Trial Tr. pp. 2781-82. Subsequently, the State put Hildenbrant on the stand. He testified that he had asked her whether she thought Bradford was guilty and that she responded, "I don't know, he's been acting strange lately, he's crazy." *Id.* at 3735. Bradford argues that the jury improperly considered this prior inconsistent statement as substantive evidence and it was highly prejudicial.

We disagree as to the question of prejudice. Bradford conceded at trial that his behavior in the days following Lohr's murder could be described as "crazy" because he worried about the possibility of intruders coming into his house or a fire breaking out. *Id.* at 3452–53. Thus, Dawn's characterization of his conduct was supported by other evidence. Under the circumstances of all of the evidence presented in the case, we cannot conclude that Dawn's prior inconsistent statement prejudiced Bradford to the extent that the outcome would have been different if

Bradford's counsel had objected to Final Instruction Fourteen and the jury had not been told it could consider prior inconsistent statements as substantive evidence.

*Bradford II*, 988 N.E.2d at 1204-05.

Mr. Bradford argues that the Indiana Court of Appeals improperly applied *Strickland*'s prejudice prong. Instead of directly explaining what about the Indiana Court of Appeals' application of the prejudice prong was unreasonable, Mr. Bradford essentially repeats the prejudice arguments made before the state court regarding the impeachment of Mr. Davie and Ms. Bradford.[12] [*See* Filing No. 23 at 55-57; Filing No. 35 at 25-26.]

Mr. Bradford fails to demonstrate that the Indiana Court of Appeals unreasonably applied *Strickland*'s prejudice analysis. First, as to the impeachment of Mr. Davie with his prior deposition testimony, the Indiana Court of Appeals observed that Mr. Bradford could not have been prejudiced because, even if the correct jury instruction were given pursuant to *Modesitt*, Mr. Davie's deposition testimony was under oath and thus was admissible under *Modesitt*. *See Bradford II*, 988 N.E.2d at 1205. In other words, Mr. Davie's deposition testimony was admissible under either the outdated or the correct jury instruction, and thus no prejudice could flow from the improper instruction. Mr. Bradford does nothing to dispute, or even acknowledge, the Indiana

---

[12] Mr. Bradford also argues that the Indiana Court of Appeals misapplied *Strickland*'s prejudice analysis because it stated that it "could not conclude" that the outcome would have been different, and *Strickland* only requires a "reasonable probability that . . . the result of the proceeding would have been different," which "is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. But Mr. Bradford reads too much into isolated linguistic choices of the Indiana Court of Appeals to argue that it applied the wrong standard. At the outset of the Indiana Court of Appeals' analysis, they set forth the exact prejudice standard set forth in *Strickland*. *See Bradford II*, 988 N.E.2d at 1201 ("To establish prejudice, a defendant must show a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's errors, the result of the proceeding would have been different."). And a review of its analysis in its entirety does not demonstrate that it deviated from this standard, even if it did not repeat the "reasonable probability" language for each ineffective assistance of counsel claim.

Court of Appeals' reasoning in this regard.  Given this, there is nothing that would allow the Court to conclude that the Indiana Court of Appeals unreasonably applied *Strickland* in concluding that Mr. Bradford was not prejudiced by Jury Instruction 14.

Second, as to the impeachment of Ms. Bradford, the Indiana Court of Appeals concluded that Mr. Bradford was not prejudiced because he testified that he was acting crazy in the days after Ms. Lohr's death, and thus Officer Hildenbrant's testimony that Ms. Bradford had said that Mr. Bradford has been acting "crazy" was duplicative and thus not prejudicial.  Mr. Bradford does not dispute this and, more importantly, the evidence bears it out.  Mr. Bradford testified during trial as follows:

> Q.    There's been some testimony about after the murder you acting crazy or something like that, you remember that testimony?
>
> A.    Testimony from Dawn [Bradford].
>
> Q.    What were your actions after [Ms. Lohr's] murder those first few days?
>
> A.    I guess it was pretty crazy.  I didn't sleep cause every time I'd go to sleep I'd wake up thinkin' there was a fire, you know, thinkin' somethin' was wrong, you know, I'd wake up startled and I kept thinking somebody was in the house or getting in the house and I'd grab a gun out of the closet and go outside and look for this intruder that wasn't there and I wasn't seeing things but I was paranoid and I spent a few days like that.

Trial Tr. at 3452-53.  Because Mr. Bradford was given the opportunity to address his wife's testimony and corroborated a significant part of it, this Court concludes that it was not unreasonable for the Indiana Court of Appeals to conclude that he was not prejudiced by the fact that Ms. Bradford's testimony could have been improperly used as substantive evidence by the jury.

Although Officer Hildenbrant also testified that Ms. Bradford told him that she did not know whether Mr. Bradford committed the crimes, the Indiana Court of Appeals' conclusion that

this was not prejudicial "[u]nder the circumstances of all of the evidence presented in the case," *Bradford II*, 988 N.E.2d at 1205, was not unreasonable.  The Court's review of the evidence reveals that the primary crux of this case was whether Mr. Bradford had the opportunity to kill Ms. Lohr during the early portion of his night shift and the opportunity to set fire to her house the following morning.  Both parties' briefing corroborates this view of the case.  Given this, it was not unreasonable for the Indiana Court of Appeals to conclude that an improper jury instruction allowing certain evidence unrelated to the two critical questions of opportunity—a portion of which, in any event, was corroborated by Mr. Bradford and thus could have no additional prejudicial impact—to be considered as substantive evidence of guilt did not prejudice Mr. Bradford.

For these reasons, Mr. Bradford is not entitled to habeas relief on this claim.

**Ground V:    Ineffective Assistance of Appellate Counsel**

An ineffective assistance of appellate counsel claim is governed by similar legal standards as those set forth above regarding Mr. Bradford's ineffective assistance of trial counsel claim. However, there are additional requirements for an ineffective assistance of appellate counsel claim. The Court will set forth these additional requirements before addressing Mr. Bradford's two ineffective assistance of appellate counsel claims.

"Appellate lawyers are not required to present every nonfrivolous claim on behalf of their clients—such a requirement would serve to bury strong arguments in weak ones—but they are expected to 'select[] the most promising issues for review.'"  *Shaw v. Wilson*, 721 F.3d 908, 915 (7th Cir. 2013) (quoting *Jones v. Barnes*, 463 U.S. 745, 752-53 (1983)).  "For this reason, if [the petitioner's appellate counsel] abandoned a nonfrivolous claim that was both 'obvious' and 'clearly stronger' than the claim that he actually presented, his performance was deficient, unless

his choice had a strategic justification." *Id.*; *see Sanders v. Cotton*, 398 F.3d 572, 585 (7th Cir.

2005). "This standard is difficult to meet because the comparative strength of two claims is usually

debateable." *Shaw*, 721 F.3d at 915. Appellate counsel's performance is assessed "from the

perspective of a reasonable attorney at the time of [the] appeal, taking care to avoid the distorting

effects of hindsight." *Id.* (citation and quotation marks omitted); *see also Lockhart v. Fretwell*,

506 U.S. 364, 372 (1993).

### 1.   *Failure to Raise Improper Opinion Testimony*

Mr. Bradford argues that his appellate counsel rendered ineffective assistance by failing to

appeal the issue of whether Firefighters Baugh and Owen were improperly permitted to give

opinion testimony regarding the duration of the fire.

In denying Mr. Bradford's ineffective assistance of appellate counsel claim, the Indiana

Court of Appeals reasoned as follows:

> At the time of Bradford's trial, the Indiana Rules of Evidence had not yet been
> adopted. Still, it was well established that for a witness to qualify as an expert in a
> specific field, the subject matter must be related to some scientific field beyond the
> knowledge of the average lay person, and the witness must have sufficient skill,
> knowledge, or experience in the field to make it appear that the witness's opinion
> will aid the trier of fact. *Wissman v. State*, 540 N.E.2d 1209, 1212 (Ind. 1989). Even
> if evidence is not beyond the knowledge and experience of the average juror, the
> expert may nevertheless testify concerning special knowledge of the subject. *Id.* at
> 1213.
>
> Baugh was a captain with the Evansville Fire Department. He had been with the
> department for ten years and had fought at least fifty fires. Trial Tr. pp. 1054–55.
> He attended seminars in firefighting and had been certified as a Master Firefighter
> in tactics. *Id.* at 1054. Baugh's training also included studying the manner in which
> fires burn under different conditions and the effects of ventilation on fires. *Id.* at
> 1082. Owen had been with the Evansville Fire Department for twenty-one years
> and worked on hundreds of fires. *Id.* at 1122. They both testified that based on the
> amount of smoke coming from Lohr's house, it had only been burning a short time.
> *Id.* at 1087, 1133–34. Bradford objected to Baugh and Owen testifying as experts.
> At one point, Bradford said Baugh was not specifically qualified to testify as an
> expert on "fire behavior," and the trial court determined that the objection went "to
> weight not admissibility." *Id.* at 1073.

> Bradford's appellate counsel could have reasonably concluded that the Supreme Court would affirm the trial court's decision to allow Baugh and Owen to testify as witnesses with specialized knowledge. *See Wissman*, 540 N.E.2d at 1213 (no error in allowing pathologist to testify to the angle of the gunshot wound, although the pathologist lacked specialized training in ballistics, because the lack of that specialized training went to the weight of the testimony, not admissibility, in light of his other qualifications). Consequently, it would have been a reasonable choice for counsel to present other, stronger issues instead. None of the claims counsel presented on appeal prevailed, but we cannot say that the claim Bradford presents here was stronger than each of the claims that counsel chose to raise. We find no clear error in the post-conviction court's ruling.

*Bradford II*, 988 N.E.2d at 1206.

Mr. Bradford argues that Indiana Court of Appeals' rejection of his claim was improper, but fails to address the necessary components of an ineffective assistance of counsel claim to be entitled to relief. First, he argues that the claim was obvious from the record because trial counsel strenuously objected to the firefighters' testimony. [*See* Filing No. 23 at 58-59.] This is sufficient to demonstrate that a claim was obvious. *See Shaw*, 721 F.3d at 916 ("Trial counsel's preservation of a claim can make it obvious."). But his only other argument is that the firefighters' testimony was important in that it had a "profound effect" on the jury. [*See* Filing No. 23 at 59.] Thus, Mr. Bradford did not even confront the Indiana Court of Appeals' reasoning that his appellate counsel had grounds to doubt the strength of this claim altogether—it arguably lacked any merit given that the firefighters had specialized knowledge—let alone that it was clearly stronger than the other claims appellate counsel raised. A successful ineffective assistance of appellate counsel claim requires the petitioner to show that the unraised claim was "'clearly stronger' than the claim[s] that he actually presented." *Shaw*, 721 F.3d at 915. It is Mr. Bradford's burden to establish this, *Harding*, 380 F.3d at 1043 ("The habeas applicant has the burden of proof to show that the application of federal law was unreasonable."), and his failure to do so, and failure to explain why the Indiana Court of Appeals unreasonably applied *Strickland*, precludes relief on this claim.

2.     *Failure to Raise Alleged False Statements by Jurors During Voir Dire*

Mr. Bradford argues that his appellate counsel rendered ineffective assistance by failing to raise a claim regarding the two jurors who allegedly made false statements during voir dire by stating that they had never been charged with a crime when they actually had.  The respondent argues that this claim is procedurally defaulted because Mr. Bradford failed to adequately raise it in state court.  Mr. Bradford does not directly address the alleged procedural default regarding this claim, but he generally relies on his purported showing of actual innocence to excuse any procedural defaults in this case.  As discussed above, in the circumstances of this case the Court finds it most prudent to bypass the actual innocence exception to procedurally defaulted claims and resolve Mr. Bradford's allegedly defaulted claims on the merits.  *See Brown*, 599 F.3d at 610.

A successful challenge to the jurors' allegedly false testimony requires the petitioner to "show that a juror failed to answer honestly a material question on voir dire, and, . . . that a correct response would have provided a valid basis for a challenge for cause."  *Arreola v. Coudry*, 533 F.3d 601, 607 (7th Cir. 2008) (citation and quotation marks omitted).  The result of a trial will not be overturned "because of a juror's mistaken, though honest response to a question."  *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 555 (1984); *see also State v. Dye*, 784 N.E.2d 469, 473 (Ind. 2003) (applying the *McDonough* standard).

The respondent points the Court to affidavits by the two jurors' in question, both of which state that they believed they truthfully answered "no" to the question of whether they had been charged with the commission of a crime even though they had been arrested for drunk driving because they completed the DADS program, which removes it from their record.  *See* Supp. R. at 399, 402.  Mr. Bradford does not address this evidence, and thus the undisputed record shows that

46

the jurors' answers were honest, even if they may have been mistaken, which precludes relief on this claim.  *See McDonough*, 464 U.S. at 555.

More importantly, even if the resolution of the underlying claim were questionable, Mr. Bradford failed to explain why this claim was "obvious" and "clearly stronger" than the claim his appellate counsel raised.  *Shaw*, 721 F.3d at 915.  Accordingly, he failed to carry his burden that appellate counsel rendered deficient performance and is not entitled to habeas relief on this claim.

### Ground VI:   Prosecutorial Misconduct

Mr. Bradford contends that the State used false evidence to impeach his expert Mr. Davie and elicited false testimony from Agent Johnson in violation of his due process rights.  The Supreme Court has "made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice."  *Giglio v. United States*, 405 U.S. 150, 153 (1972); *see Napue v. Illinois*, 360 U.S. 264, 269 (1959); *see also Bland v. Hardy*, 672 F.3d 445, 447 (7th Cir. 2012) ("*Napue* and *Giglio* hold that a prosecutor may not offer testimony that the prosecutor knows to be false.").  "A new trial is required if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury."  *Giglio*, 405 U.S. at 153.

The respondent contends that Mr. Bradford's prosecutorial misconduct claims are procedurally defaulted.  As with Mr. Bradford's other claims that the respondent maintains are procedurally defaulted, the Court finds it prudent to not resolve the issue of procedural default and instead proceed directly to the merits of Mr. Bradford's claims.  *See Brown*, 599 F.3d at 610.  Given that the Indiana Court of Appeals also alternatively addressed these claims on the merits,

the Court's review remains subject to AEDPA.  The Court will address each of the alleged uses of false evidence in turn.

### 1. Impeachment of Mr. Davie

The State engaged in the following exchange at trial with Mr. Bradford's expert, Mr. Davie:

Q.      You told me in a deposition that you thought this could be a seven minute fire, right?

A.      I don't believe I said that at all.  Can you quote me the line and page?

Q.      About page 48, line 14, well a couple of lines up here.  Answer: "Seven minute fire with that much heat that would still be pushing it."  Question: "But I'm looking for the absolute outside.  Are you saying that's possible?  Answer: "Not probable but possible.  Only very, very, very remotely possible."

A.      That's correct, the least degree of possibility that I can think about.

Trial Tr. at 3230.

Mr. Bradford maintains that the State elicited false evidence by creating the impression that Mr. Davie had stated that the fire's duration could have been only seven minutes, while Mr. Davie actually stated in his deposition that the fire could have started only seven minutes before Mr. Bradford called it in.  The Indiana Court of Appeals did not address whether the State had indeed introduced a false impression of the evidence, but instead reasoned that to the extent it was, Mr. Bradford was not prejudiced: "Bradford's trial counsel rehabilitated Davie on redirect by allowing him to reiterate his opinion that the fire's duration was at least fifteen minutes, so the prosecution's use of Davie's deposition to allegedly mislead him on cross-examination into apparently agreeing that the fire was of much shorter duration did not place Bradford in grave peril." *Bradford II*, 988 N.E.2d at 1201 n.3.

The Indiana Court of Appeals reasonably determined that any false impression created by the State's questioning of Mr. Davie did not prejudice him because his testimony was clarified during redirect examination.  Mr. Davie testified as follows during redirect:

> Q.    Mr. Davie, do you know of anything after your cross-examination and this testimony that changes your opinion about the length of time that the fire could have burned?
>
> A.    No.
>
> Q.    [The prosecutor] asked you about the very, very, very possibly seven minutes, correct?  But is it a fair statement to say that consistent with the evidence in front of you  and not leading into speculation so much the fire would likely burn longer than seven minutes?
>
> A.    Yes, it would.
>
> Q.    Your opinion is fifteen minutes or longer?
>
> A.    That's correct.

Trial Tr. at 3254-55.

Although Mr. Bradford argues that his was not allowed during redirect to clarify or correct the misconception created by the State, [*see* Filing No. 23 at 63], the Court disagrees.  The foregoing portion of redirect clearly shows that Mr. Bradford's trial counsel raised the issue regarding Mr. Davie's testimony on cross-examination about a seven-minute fire and allowed Mr. Davie to clarify his testimony; indeed, Mr. Davie had the opportunity to directly address the prosecutor's questions regarding a seven-minute burn, and further, had the opportunity to make clear that his expert opinion was that the fire burned for fifteen minutes or longer.[13]  Given the

---

[13] The Court also notes that it is unclear whether the State created any false impression of the evidence when questioning Mr. Davie regarding his deposition testimony.  Regardless of what Mr. Davie stated in his deposition, the impression created on cross-examination—that there was a remote possibility that the fire's duration could have been only seven minutes—was confirmed by Mr. Davie and defense counsel during redirect.  He responded in the affirmative to the question of whether "the fire would likely burn longer than seven minutes."  Trial Tr. at 3254-55.

deferential standard of review, the Court finds that the appellate court did not unreasonably apply *Giglio*'s prejudice analysis by reasoning that any prejudice was mitigated on redirect. Accordingly, Mr. Bradford is not entitled to relief on this claim.

> 2.  *Agent Johnson's Testimony*

The State called Agent Donald Johnson, a Special Agent with the United States Treasury Department's Bureau of Alcohol, Tobacco, and Firearms, to testify regarding the fire, and his testimony was contrary to Mr. Davie's in several respects.  During his redirect examination, the State elicited the following testimony from Agent Johnson:

> Q.    How are you getting paid?
>
> A.    I draw a salary from the United States Treasury Department.
>
> Q.    Do you collect any kind of special fees to come here today or any kind of private expenses to come here and testify today?
>
> A.    No, this is my job.

Trial Tr. at 3836.  Mr. Bradford attempted to demonstrate that Agent Johnson's testimony was false during post-conviction proceedings by introducing a newspaper article, which stated that Agent Johnson was reimbursed "$727.46 for travel and meal expenses."  PCR Tr., Ex. 27 at 2. The Indiana Court of Appeals reasoned that, "in light of all of the evidence presented at trial, we cannot say that the jury's verdict was affected by the State's failure to tell the jury that it paid or intended to pay Johnson's travel and meal expenses."  *Bradford II*, 988 N.E.2d at 1201 n.3.

Mr. Bradford argues that the Indiana Court of Appeals improperly denied this claim because whether the parties' respective fire experts were being paid for their testimony (his expert, Mr. Davie, was) was repeatedly emphasized by the State during closing arguments.  In other words, Mr. Bradford maintains that the State attempted to convince the jury that Mr. Davie testified as he did because he was getting paid, while the State's fire experts were not, and Agent Johnson's

allegedly false testimony that he was not getting paid or receiving private expenses bolstered the State's argument.  [*See* Filing No. 23 at 62-63.]

The Court does not conclude that the Indiana Court of Appeals unreasonably determined that Mr. Bradford was not prejudiced by Mr. Johnson's allegedly false testimony.[14]  At most, the jury was unaware that Agent Johnson received $726.46 to reimburse his expenses—not in payment for his testimony.  Given that Mr. Davie was paid $125 an hour for his testimony, even if the jury knew that Agent Johnson's expenses were reimbursed, the State's argument juxtaposing the parties' experts would lose little, if any, force.  It is reasonable to conclude that the jury would understand that reimbursement for travel and meal expenses as part of one's job would not create nearly the same incentives to testify in a certain manner as would payment of $125 an hour.

Accordingly, it was not unreasonable for the Indiana Court of Appeals to conclude that the jury's verdict was not affected by Agent Johnson's allegedly false testimony, and thus Mr. Bradford is not entitled to relief on this claim.

**Ground VII:  Cumulative Error**

Mr. Bradford argues that, even if one error was not sufficiently prejudicial to warrant habeas relief, the errors taken together entitle him to relief.  "Trial errors which in isolation are harmless might, when aggregated, alter the course of a trial so as to violate a petitioner's right to due process of law."  *Alvarez v. Boyd*, 225 F.3d 820, 824 (7th Cir. 2000).  "To prevent the synergistic effect of these errors from escaping review, courts attempt to determine whether the whole is greater than the sum of its parts."  *Id.*  "To demonstrate cumulative error, [the petitioner]

---

[14] The Court need not decide whether Agent Johnson's testimony was false.  The Court instead follows the course charted by the Indiana Court of Appeals by addressing only prejudice.  However, the Court notes that the post-conviction court rejected Mr. Bradford's claim on the ground that Agent Johnson's testimony did not amount to a materially false statement.

must show that (1) at least two errors were committed during the trial, and (2) these errors denied [the petitioner] a fundamentally fair trial." *United States v. Adams*, 628 F.3d 407, 419 (7th Cir. 2010). "As to the second prong . . . , the Constitution entitles the petitioner to a fair trial, not a perfect one." *Alvarez*, 225 F.3d at 824. Therefore, relief is warranted only if the Court is "firmly convinced that but for the errors, the outcome of the trial probably would have been different." *Id.*; *see United States v. Allen*, 269 F.3d 842, 847 (7th Cir. 2001).

As to the first prong, the Court identified several errors during trial. Certain of these errors were assumed because it was more efficient to dispose of certain claims by concluding that any error did not prejudice Mr. Bradford, or because the Court assumed without deciding that certain claims were not procedurally defaulted. Nevertheless, the Court will consider those errors for the purposes of its cumulative error analysis. For the errors identified below, the Court already evaluated their prejudicial effect in detail above and incorporates by reference that analysis here. Thus, for the purposes of this analysis, the Court will only summarize the prejudicial effect of those errors here.

The Court identified the following errors:

· (1) Mr. Bradford was denied his right to be present during a hearing concerning whether the jury would be permitted a second visit to the crime scene during deliberations. This had little to no prejudicial effect because Mr. Bradford was ably represented by counsel at this hearing, and moreover, the jury had already visited the crime scene once so there is no reason to think that even if Mr. Bradford had been present at the hearing he would have objected, let alone changed the hearing's result.

· (2) Mr. Bradford's trial counsel rendered deficient performance in failing to impeach Mr. Russell with his 1986 robbery conviction. This failure had little prejudicial effect given that trial counsel established that Mr. Bradford had previously arrested Mr. Russell, which shows both that Mr. Russell had previously been in trouble with law enforcement and, more importantly, had a more personal motive for potential bias against Mr. Bradford.[15]

---

[15] The Court notes that Mr. Russell's testimony related only to whether Mr. Bradford had the opportunity to murder Ms. Lohr, while most of the other errors identified (and the other errors alleged by Mr. Bradford) relate only to whether Mr. Bradford had the opportunity to commit arson

- (3)  Mr. Bradford's trial counsel rendered deficient performance in failing to object to improper Jury Instruction 14.  According to Mr. Bradford, this was prejudicial in two ways, but as analyzed above, the Court disagrees.  First, Mr. Davie's deposition testimony would have been admissible even under the correct instruction, so the improper jury instruction had no prejudicial effect.  Second, Officer Hildenbrant's testimony that Ms. Bradford said Mr. Bradford was acting "crazy" had little prejudicial effect given that Mr. Bradford himself agreed that he was acting "crazy" in the days following Ms. Lohr's murder.

- (4)  The State improperly introduced false evidence and elicited false testimony.  As to the false impression the State allegedly created regarding Mr. Davie's deposition testimony, this had limited prejudicial effect given that Mr. Davie was able to further discuss and clarify his testimony during redirect examination by Mr. Bradford's counsel.  Regarding Agent Johnson's alleged false testimony regarding reimbursement of his travel and meal expenses, this also had limited prejudicial effect given that the State's argument—that Mr. Davie was being paid a large sum for his testimony while Agent Johnson was not—would have been nearly as forceful even if Agent Johnson had testified that he received reimbursements for expenses.

Analysis of whether the foregoing errors denied Mr. Bradford a fundamentally fair trial "requires an examination of the entire record, paying particular attention to the nature and number of alleged errors committed; their interrelationship, if any, and their combined effect; how the trial court dealt with the errors, including the efficacy of any remedial measures; and the strength of the prosecution's case."  *Alvarez*, 225 F.3d at 825.  The Court has conducted this analysis and cannot conclude that the combined effect of the errors denied Mr. Bradford a fundamentally fair trial.  The foremost reason is simply that none of the individual errors had a significant prejudicial effect.  Relatedly, there is little, if any, interrelationship between the errors, and thus the prejudicial effect of the individual errors do not amplify each other such that their sum is greater than their individual parts.

---

the next morning.  While the State's theory was that the same person committed both the murder and the arson, the jury was not required to accept that theory.  Therefore, in assessing prejudice, to which crime the alleged prejudicial effect alleged relates is relevant in assessing whether relief is warranted.  Put simply, even if Mr. Bradford had shown that he is entitled to relief on the arson conviction (which he has not), it does not necessarily follow that he is entitled to relief on the murder conviction.

The State's case against Mr. Bradford was circumstantial, but it was not so weak that the foregoing errors—which had little prejudicial effect—can be said to have denied Mr. Bradford a fundamentally fair trial.  As discussed above, the Court's review of the evidence reveals that the most critical and highly disputed aspects of this case were whether Mr. Bradford had the opportunity to kill Ms. Lohr during the early portion of his night shift and the opportunity to set fire to her house the following morning.  The errors identified, individually or in combination, had only a limited potential effect on the jury's evaluation of these key questions, given the mountain of evidence presented by both parties regarding them.

As stated above, "the Constitution entitles the petitioner to a fair trial, not a perfect one." *Id.* at 824.  While his trial may not have been perfect, the Court is not "firmly convinced that but for the errors, the outcome of the trial probably would have been different."  *Id.*

For these reasons, Mr. Bradford is not entitled to relief on this claim.

## IV.
## Conclusion

It is the "jury's prerogative" to weigh the evidence presented in a case, and "[i]n this case, the verdict reveals that the jury decided to believe the prosecution's witnesses [and evidence] over the testimony of [the defendant's]."  *Taylor*, 448 F.3d at 951.  Following the jury's decision, Mr. Bradford challenged his convictions in state court but these challenges failed, and thus a presumption of constitutional regularity attaches to his convictions.  *See Farmer v. Litscher*, 303 F.3d 840, 845 (7th Cir. 2002) (citing *Parke v. Raley*, 506 U.S. 20, 29-30 (1992)).  As the foregoing discussion demonstrates, he failed to carry his burden in this Court "of overcoming this presumption."  *Id.*

This Court has carefully reviewed the state record in light of Mr. Bradford's claims and has given such consideration to those claims as the limited scope of its review in a habeas corpus

proceeding permits.  The claims which were properly preserved in the Indiana state courts do not warrant relief in light of the deferential standard required by the AEDPA.  *See Harrington*, 562 U.S. at 101 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision.") (citation and quotation marks omitted).  And those that the Court reviewed *de novo* were also insufficient to warrant habeas relief.  Mr. Bradford's amended petition for writ of habeas corpus is therefore **denied.**

Judgment consistent with this Entry shall now issue.

# V.
## Certificates of Appealability

Rule 11(a) of the *Rules Governing § 2254 Cases* requires the district courts to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and "[i]f the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  Pursuant to § 2253(c)(2), a certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  Such a showing includes demonstrating "that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citation and quotation marks omitted).

The court concludes that the following claims' resolution could be debated by reasonable jurists or that they are adequate to deserve encouragement to proceed further, and therefore, this Entry shall constitute a certificate of appealability as to the following:

· Ground I:  Insufficiency of the evidence

· Ground III:  Juror experiments during the crime scene visit

· Ground IV(1): Ineffective assistance of trial counsel, only regarding the adequacy of Mr.

  Bradford's trial counsel's selection of a fire expert

  The Court **denies** a certificate of appealability as to the other claims.

  **IT IS SO ORDERED.**

Date:   _11/10/2015_

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

Electronically Registered Counsel